**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | |
|---|---|
| LAUREN RICHWINE and DEATH DONE DIFFERENTLY LLC, | Case No. 1:23-cv-370 |
| *Plaintiffs*, | |
| v. | **Complaint** |
| KATHLEEN DIANE MATUSZAK, THOMAS SPROLES, FRANK DOWNING, and CHRISTOPHER COOKE, in their official capacities as members of the Indiana State Board of Funeral & Cemetery Service; THEODORE ROKITA, in his official capacity as Attorney General of Indiana; and LINDSAY HYER, in her official capacity as Executive Director of the Indiana Professional Licensing Agency, | |
| *Defendants*. | |

---

**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

---

### INTRODUCTION

1.      This civil-rights lawsuit seeks to vindicate the First Amendment rights of Plaintiffs Lauren Richwine and Death Done Differently LLC ("Death Done Differently") to advise and guide families through the deeply personal choices surrounding both the end of life and being remembered after life. Lauren describes herself as a "community death care advocate" and is part of a growing national movement rethinking the practices, customs, and approaches surrounding death. Lauren shares her knowledge about end-of-life options with families to help them put their own end-of-life plan in place that is best for them and their loved ones. By engaging in these difficult but important conversations, Lauren can give families the practical, emotional, and non-technical support that funeral directors do not typically provide.

1

2.      But beginning in 2021, the State of Indiana began investigating Lauren's business under Indiana's Embalmers and Funeral Directors Laws. Though Lauren does not hold herself out as a licensed funeral director or engage in the technical conduct of licensed funeral professionals (such as embalming), the Indiana State Board of Funeral and Cemetery Service ultimately ordered that Lauren and Death Done Differently cease and desist from speaking with other adults about death care unless and until they obtain both a funeral-director license and a funeral-home license.

3.      Because those licenses are so burdensome to obtain, in practice Defendants have imposed a complete gag order on Plaintiffs from speaking about death. These actions violate Plaintiffs' First Amendment free-speech rights, whether that speech is in the form of one-on-one consultations, educational lectures to the public, comments about Indiana's funeral laws, or truthful advertisements about those services.

## JURISDICTION AND VENUE

4.      Plaintiffs bring this civil rights lawsuit pursuant to the First and Fourteenth Amendments to the United States Constitution; the Civil Rights Act of 1871, 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. § 2201.

5.      Plaintiffs seek declaratory and injunctive relief against Defendants' future enforcement of Indiana's Embalmers and Funeral Directors Laws ("Indiana's funeral laws"), Ind. Code tit. 25, art. 15; regulations promulgated under Indiana's funeral laws, 832 Ind. Admin. Code 1-1-1 *et seq*.; and the policies and practices of Defendants that deny Plaintiffs' ability to speak with adults regarding death care.

6.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

7.      Venue lies in this Court under 28 U.S.C. § 1391(b).

## PARTIES

8.      Plaintiff Lauren Richwine is a United States citizen and lifelong resident of Fort Wayne, Indiana, where she lives with her two daughters. Lauren is the sole owner of Death Done Differently LLC.

9.      Plaintiff Death Done Differently LLC is an Indiana limited liability company.

10.     Defendants Kathleen Diane Matuszak, Thomas Sproles, Frank Downing, and Christopher Cooke are members of the Indiana State Board of Funeral and Cemetery Service (the "Board"). Matuszak is the Board's Chairman and Sproles is the Board's Vice Chairman. The Board members are responsible for adopting and enforcing regulations under Indiana's funeral laws, including issuing show-cause orders and cease-and-desist orders. Ind. Code § 25-1-7-14. They are all sued in their official capacities.

11.     Defendant Theodore (Todd) Rokita is the Attorney General of Indiana. He is responsible for receiving, investigating, and prosecuting all complaints regarding the licensure of funeral directors and funeral homes, Ind. Code. § 25-1-7-2, and filing motions for cease-and-desist orders. He is sued in his official capacity.

12.     Defendant Lindsay Hyer is the Executive Director of the Indiana Professional Licensing Agency ("IPLA"), the umbrella state agency in which the Board is situated. As head of the IPLA, she is ultimately responsible for receiving and submitting consumer complaints of funeral law violations to the Attorney General. She is sued in her official capacity.

## STATEMENT OF FACTS

### Lauren Is Part Of A Nationwide Movement Rethinking End-of-Life Care.

13.     Lauren is one of many individuals across the country rethinking the practices, customs, and expenses of passing away. Those in the movement rethinking death who share their knowledge with others are often called "death doulas" or "death midwives."

14.     Death doulas differ from conventional funeral directors, nationwide and in Indiana. Licensed funeral directors usually have an arms-length relationship with their clients

3

and rarely provide the personal, nonmedical, or emotional support that Lauren and other death doulas can provide to the dying and their families.

15.     As a death doula and community death care advocate, Lauren seeks to inform the dying, their families, and the public at large of all their options regarding death care in Indiana. This often includes sharing information about services that conventional funeral directors and funeral homes offer. It also includes sharing information about alternatives to conventional funerals, such as environmentally conscious "green burials," home funerals, and other alternative funeral arrangements—some of which are provided by licensed funeral professionals, but some of which can be done by the family itself.

16.     For instance, a traditional home funeral is one alternative common in most of the world, most of history, and still in the United States in certain faith traditions, such as the Catholic wake or Jewish shemira (watching over and guarding the body). Ceremonies like these can be more intimate and personalized to a family's needs. They often occur in the home, where there is greater privacy, intimacy, and freedom to personalize saying goodbye to a loved one. Home funerals allow families to honor their own beliefs and are legal in all 50 states, including Indiana.

17.     Other alternatives growing in popularity include options for disposition of remains that take into account the ecological downsides of conventional cremation or burial with an elaborate casket. Options such as "green burial" avoid energy-intensive means or non-bio-degradable materials.

18.     There is no legal presumption that when a person dies, that person's remains present a risk of infectious disease or any other health condition. In ordinary circumstances, human remains present no material health and safety risk to those in the presence of the body for at least the first 72 hours after death.

19.     In fact, what many now think of as a conventional funeral—involving embalming the body, holding a ceremony in a funeral parlor, and cremation or burying in an expensive casket—is a historically recent innovation.

20.     This now-conventional system often medicalizes death, making it the province of hospitals and hospice, without creating an emotionally supportive space for a dying person and their family to consider how they wish to approach death and to be remembered.

21.     Death doulas have a unique role in the continuum of care that a client's medical providers or hospice workers do not fulfill. The dying process itself is hard to talk about with family or doctors, and patients often do not want to seem a burden to busy medical professionals. And funeral directors are typically retained only after death and do not typically participate in emotional conversations about preparing for death.

22.     Death doulas fill this gap. They help the dying and their families decide among the options available for death, with the emotional support and detachment that comes with somebody who is not herself selling expensive goods and services like a casket or embalming.

23.     Death doulas can also be advocates for the dying person with doctors, with funeral directors, and with the family. They develop a more personal and emotional connection. They can discuss options for the dying and their families to direct their own death care, like medical directives.

24.     They can also discuss the options available for being remembered. Because they are not selling funeral services or merchandise, death doulas can help their clients understand those options without a financial conflict of interest.

### Lauren Joined The Movement To Encourage Others To Consider Their End-Of-Life Care Options.

25.     Lauren graduated from Taylor University in 2009 with a bachelor's degree in creative writing.

26.     Lauren became interested in end-of-life care while working as a hospice volunteer in 2016.

27.     During her time as a volunteer, Lauren became troubled by gaps in the continuum of care from diagnosis until death.

28.    Lauren was further troubled by what she terms a "death-phobic culture," in which people are unlikely to engage in the important conversations surrounding death, such as how and where a person wants to die and what the decedent wants after death.

29.    Because that death-phobic culture makes conversations about death taboo, families are frequently caught off-guard when it comes to making important end-of-life care decisions, often at the most emotionally fraught times and when the dying person is no longer able to participate in these important conversations and decisions.

30.    Lauren wanted to tackle this death-phobic culture by educating and talking with adults about end-of-life care before it is needed. She uses the direct phrase "death care" to affirm the reality of death, promote healthy grieving, and respect her clients' diverse moral and religious beliefs.

31.    Seven years ago, to build up her knowledge of death care, Lauren began reading books, listening to podcasts, attending programs and an in-person mentorship, speaking with licensed funeral directors, and joining the principal associations and alliances for death doulas.

32.    Lauren is a trained facilitator through the "Respecting Choices Advance Care Planning" Program run by the Parkview Health network of hospitals and clinics. This certification involved training to assist the dying and their families make advance care planning decisions about healthcare in line with their goals and values.

33.    She is currently a member of the National Association of Certified Death Midwives, the National End-of-Life Doula Alliance, the National Home Funeral Alliance, and The Order of the Good Death.

34.    Lauren is not a licensed funeral director and does not hold herself out as one.

35.    In March 2019, Lauren founded Death Done Differently to share her knowledge with others in the form of individualized and general advice.

36.    Death Done Differently is not a licensed funeral home and does not hold itself out as one.

37.    Neither Lauren nor Death Done Differently has ever received any consumer complaint about the quality of the end-of-life guidance services they offer.

38.    Lauren is not aware of a single instance in which an individual mistakenly took her services as those of a licensed funeral director, nor mistook Death Done Differently as a licensed funeral home.

**Lauren's Services Consist Of Educating And Advising—
In Other Words, She Speaks To Other Adults.**

39.    Lauren's work is comparable to others in the movement rethinking death care, who often describe themselves as "death doulas" or "death midwives."

40.    Lauren uses her knowledge of death care to help her clients navigate the deeply personal decisions around death.

41.    Until recently, Lauren advertised her individualized services on Death Done Differently's website, along with a transparent list of prices she charges. A copy of the services that were listed on the website is attached as Exhibit A. Those services included:

a.    Initial Consultation: Lauren offers to have a free, no-obligation conversation with potential clients for them to learn more about her services and ask questions. She may direct them to others in the death care community, or she may arrange future individualized services. (Always Free)

b.    Full End of Life Planning: Lauren will discuss end-of-life options with a client and their family. Topics she discusses include: funeral options, options for body disposition (including alternative such as cremation, traditional burial, or green burial), and choices families have for remembrance services. Lauren also offers to advise clients and their families about end-of-life paperwork such as a living will, do-not-resuscitate ("DNR") form, and healthcare power of attorney. ($300-$500)

c.    Advance Care Planning: Lauren will facilitate conversations with a client and their family about desired levels of medical intervention in the case of a sudden

accident or medical issue. She will assist with related paperwork such as living will, DNR form, and healthcare power of attorney. ($100-$300)

d. <u>Support for Family Led Death Care</u>: Lauren will consult as a celebrant with family. She will discuss and coordinate personal information, music and reading selections, religious acknowledgements (if any), and other programming. These conversations ideally take place prior to death so that the dying person is involved in providing their own preferences for post death care and how they would like to be remembered. ($500-$1,000)

e. <u>Visits</u>: Lauren will visit with clients and family as they approach the end of life to offer emotional support. Her tasks may include readings, music, conversation, healing touch, or general companionship with the individual prior to death. Her services do ***not*** include medical treatments, housekeeping, household chores, or childcare. ($50-$80 per hour)

f. <u>Vigil</u>: In the active stages of dying immediately leading up to death, Lauren offers to be present to provide emotional support. ($50-$80 per hour)

g. <u>Legacy Letter for Loved Ones and/or Family</u>: Lauren offers to assist a dying person in drafting a letter to loved ones and ensuring it gets to intended recipients. This leverages her creative-writing skills and background to help a dying person express themself. ($50-$100 per letter)

42.    All these services share one thing in common: they are all *speaking* or *writing*. Everything that Lauren does is expressive communication with her clients.

43.    In Lauren's one-on-one consultations, discussions and planning include topics such as:

a. How the person and their families wish to approach death and make their wishes known, including approaching important legal forms on end-of-life wishes such as the Indiana Health Care Directive, Power of Attorney, Pre-hospital Medical Care Directive, and the Indiana Funeral Planning Declaration (Lauren is rarely

8

present when a family is actually filling out paperwork, but instead advises them about what forms and options are available so that clients and their family can make informed choices to fill out the forms themselves);

b. Whether and how to leave messages to friends and loved ones, including writings or video recordings;

c. What rituals the dying person and their family wish to be included in any memorial service;

d. Where the person and family would like to hold a memorial service, whether in a religious institution, a funeral home, or in the family's home;

e. How the person would wish their remains to be disposed of, such as burial, cremation, or green burial; and

f. Who makes up the community that will support the dying person in achieving their end-of-life goals.

44.     One important part of these conversations is to identify the point person for each of the tasks. Thus, wishes about palliative medicine may be given to family and doctors, a family member may be given medical power of attorney, and transportation and burial is assigned to the funeral director. Lauren does not usurp the roles of any family member or professional but helps facilitate a plan to effect the wishes of the dying and their family.

45.     Lauren also teaches families concepts and skills for approaching grief, including how to process grief healthily and how to best support the friends and family members most intimately affected by a death.

46.     If a family chooses to conduct a home funeral, Lauren can provide verbal guidance during the home funeral, such as guidance on dressing the deceased's body or placing cooling packs around the body. None of this involves specialized technical or medical knowledge, and these are all things that a family can lawfully do for themselves. Lauren does not physically participate in anything involving human remains, but simply provides emotional support and verbal guidance.

47.    Indiana law requires all families of the deceased to hire a funeral director to arrange for final disposition, so all Lauren's clients have access to a licensed funeral director's services in addition to Lauren's guidance.

48.    In fact, most of Lauren's clients choose to pursue a more conventional funeral.

49.    Lauren has good relationships with licensed funeral directors who share her open-minded attitude to death.

50.    One service Lauren offers is to provide guidance and support to families who are selecting funeral-director services. She offers to go with a client and their family to a funeral home and support the family as it considers its options and what death services it wishes. In this role, Lauren acts just as a friend or relative would in having these conversations with a funeral director to ensure that her clients are comfortable and feel empowered as they plan for their own death or their loved one's death.

51.    Lauren's individualized advising does *not* involve:

   a.    Acting as the family's agent for transportation services or funeral-director services;

   b.    Selling the family flowers, catering services, transportation services, or anything other than death education and planning (although she may run an errand to buy a client something simple like a linen shroud and get reimbursed at cost);

   c.    Accepting money from families to hold in trust for the future purchase of goods or services;

   d.    Advising families about technical matters that are generally beyond the scope of layperson knowledge, such as the embalming of remains or contagious disease;

   e.    Providing any medical care;

   f.    Advising families about anything that would be illegal for a layperson to perform during a home funeral;

   g.    Encouraging a family to have a home funeral when this is not the client's or the family's preference;

    h.   Discouraging families from having modern, full-service conventional funerals or from using the goods and services of funeral directors;

    i.   Maintaining a physical building to provide the goods and services of licensed funeral directors; or

    j.   Filling out government documents and forms or filing such forms with government offices.

52.    Lauren also offers similar services for clients who are experiencing the death of a pet, rather than a human. These services, also reflected in Exhibit A, include:

    a.   <u>Animal Companion End of Life Care/Choices</u>: Lauren will discuss disposition of the pet's body with clients, make referrals for in-home euthanasia if desired, and discuss final-goodbye and memorial options. ($150-$300)

    b.   <u>After Death Care for Animal Companion (in home)</u>: Lauren will facilitate care for an animal companion in a client's home following death. These services may include shrouding, guiding the family in burial, or accompanying the family at a cremation. ($150-$300)

53.    In addition to the individualized advice and support that she offers to clients and their families, Lauren also offers educational services.

54.    Lauren offers paid mentorship programs to others interested in joining the movement rethinking death care and in becoming death doulas themselves.

55.    In addition to Lauren's individualized advising, she gives generalized educational lectures to larger groups. These include hospice organizations, churches, and other groups at public community events. Some common themes of Lauren's talks include the history of death care in the United States, eco-friendly end-of-life choices, the necessity of mourning ritual, and mourning versus grief. These events discuss these topics generally and are not tailored to advising a specific individual or their family.

56.    Lauren also co-facilitates monthly "death cafés": free community events where individuals can gather, enjoy coffee or tea and baked goods, and openly discuss death and dying.

57.     None of Lauren's services involve the conduct of licensed funeral directors or embalmers. For instance, she does **not** do any of the following:

    a.  Embalm remains;

    b.  Store remains;

    c.  Cremate remains;

    d.  Bury or otherwise dispose of remains;

    e.  Hold money in trust for future use in disposing of remains; or

    f.  File death certificates or other legal paperwork.

58.     Lauren does not possess specialized medical or technical knowledge beyond the scope of a layperson's knowledge. Lauren is not a medical professional or a funeral director.

59.     Death Done Differently's website has been explicit that Lauren is not a funeral director and that Death Done Differently is not a funeral home. For instance:

    a.  The footer of every page of Death Done Differently's website reads: "Death Done Differently is an educational consulting organization and is in no way considered a funeral establishment."

    b.  On the FAQ page of Death Done Differently's website, Lauren stated that she is not a funeral director, and that she does "NOT perform any services that funeral directors are licensed to direct such as body care, death certificate filing, transportation, or making arrangements."

    c.  On the FAQ page of Death Done Differently's website, Lauren clarified that everyone in Indiana must hire a funeral director because only funeral directors "may be issued burial/transit permits, a state requirement for moving the body to a crematory or cemetery . . . . Their presence is also required for any formal funeral service including memorials w[here] the cremated remains are present."

    d.  On the Indiana Law tab of Death Done Differently's website, Lauren provided objective information and citations regarding Indiana's funeral laws. At the top of the page was the following disclaimer in bold: "The information provided is only

intended to be general summary information for the public. It is not intended to take the place of either the written law or regulations. The inclusion of any links does not necessarily imply a recommendation or endorse the views expressed within them."

60.    Copies of these sections of Death Done Differently's website are included in Exhibit A.

61.    In addition to the clear disclaimers on the website, Lauren intentionally avoids using language to describe herself that might confuse clients or the public. She does not use the terms "funeral director," "mortician," "undertaker," "funeral service licensee," "funeral director intern," "embalmer," "funeral home manager," or any variant of these titles.

62.    Likewise, Death Done Differently avoids phrases that might suggest it is a licensed funeral home. It does not use the terms "funeral home," "undertaking parlor," "mortuary," "memorial chapel," or any variant of these titles. Though different, Lauren also avoids using the phrase "home funeral" to avoid the possibility of confusion and instead describes home funerals using the term "in home death care."

63.    Far from acting as a funeral director, Lauren sees her services as complementary to funeral directors and funeral homes.

64.    In part because of Lauren's understanding that Indiana requires that every family hire a funeral director licensed by the state, she partners with local funeral directors and funeral homes in her death care work.

65.    The local funeral directors and funeral homes perform any specialized technical activities that Lauren's clients may wish, such as embalming remains, storage of remains, and transporting deceased persons. Lauren does not perform these activities.

66.    On the Resources tab of Death Done Differently's website, Lauren included the contact information and description of several others in the death care community, including a funeral home and funeral director, a personal grief financial assistant, and a realtor company. This page is included in Exhibit A.

67.    Lauren maintains a binder with information on local funeral homes and their prices and packages for her clients' use.

68.    Lauren will discuss with clients generally the services that funeral homes offer, but she does not detail their specific prices and packages with her clients. Instead, she directs her clients to reach out to the funeral homes for additional information.

69.    Lauren may accompany clients to a funeral home to offer emotional support and advice, but it is the funeral directors and funeral homes that discuss the specialized licensed services that they provide.

70.    Lauren endeavors to make her services available to people of all means, so she is flexible in her pricing and charges on a sliding scale based on the client's financial means. Lauren has provided her services for free to clients demonstrating significant financial hardship.

71.    Lauren also considers gifts or trade of services in lieu of financial payment.

72.    Every client receives a professional disclosure statement that highlights Lauren's qualifications and includes confidentiality terms. The professional disclosure statement also includes the contact information of Earth Traditions—an organization that educates and mentors death midwives—should a client want to file a complaint.

73.    Lauren also fills out an intake form and contract with each new client to clearly and transparently record the details of the engagement, the services Lauren will provide, and the price.

74.    Lauren hopes to expand Death Done Differently and her work in the death care space. Lauren would like to see Death Done Differently transform into a cooperative or hub in which individuals in the death care community can combine their resources, knowledge, and skills to fulfill all of the needs of a grieving family.

**The Attorney General's Office Investigates Lauren For Talking About Death Care.**

75.    Lauren does not regard herself as a funeral director.

76.    Lauren does not hold herself out as a funeral director.

77.    Lauren does not regard Death Done Differently as a funeral home.

78.    Lauren and Death Done Differently do not hold out Death Done Differently as being a funeral home.

79.    Lauren does not regard herself or Death Done Differently as competitors of funeral directors or funeral homes.

80.    Lauren and Death Done Differently have enjoyed excellent cooperative relationships with local funeral directors and funeral homes.

81.    Lauren and Death Done Differently have striven to familiarize themselves with Indiana's funeral laws.

82.    Lauren and Death Done Differently sought to comply with state law at all times.

83.    Until June 2021, Lauren was not aware of any complaints about her submitted to the Board, the Attorney General, or the IPLA.

84.    By 2021, Lauren and Death Done Differently were thriving and providing valuable services to their clients. The business was growing rapidly, and Lauren's death-care work through Death Done Differently had come to predominate her working time and was becoming a significant source of her income.

85.    But then, on June 22, 2021, the IPLA received a complaint from an unknown party alleging that Death Done Differently may be violating Indiana's funeral laws by engaging in unlicensed practice. According to the IPLA's records, the complaint did not allege that Lauren had actually harmed or deceived any consumer, but only that Death Done Differently "may require a license from the state to provide funeral service."

86.    On June 23, 2021, an IPLA compliance officer submitted this complaint to the Attorney General's Licensing Enforcement and Homeowner Protection Unit to "request[] further investigation and a 'Cease and Desist' IC 25-1-7-14."

87.    The IPLA's submission listed the following "possible statutes/rules violations": (1) Ind. Code § 25-15-2-15 (funeral home); (2) Ind. Code § 25-15-2-16 (funeral home license); (3) Ind. Code § 25-15-2-17 (funeral services); and (4) Ind. Code § 25-15-2-22 (practice of

funeral service). The IPLA submission asked that the Attorney General seek "[a]ny sanctions deemed appropriate by the Indiana Funeral and Cemetery Board."

88.     After receiving the complaint, a case analyst from the Attorney General's office called Lauren to inform her that she was under investigation. During the call, the case analyst assured Lauren that the complaint had not come from a consumer.

89.     The Attorney General's office then sent the complaint to Lauren and gave her 20 days to provide her "explanation of what happened."

90.     A copy of the notice Lauren received from the Attorney General's office with the IPLA complaint is attached as Exhibit B.

91.     Lauren was surprised to receive this notice and viewed the complaint that initiated it as a misunderstanding of Death Done Differently's work because Lauren did not think of herself as doing the work of a funeral director or funeral home.

92.     On July 7, 2021, Lauren responded by sending an email to the Attorney General's office with a letter explaining her business model. This is attached as Exhibit C.

93.     In her letter, Lauren explained that her "work is that of an educator and an advocate," not a funeral director. Specifically, Lauren stated that her work in talking about family-led death care, should that be a family's wish, "is markedly different from attempting to carry out those tasks [her]self."

94.     Lauren's letter further explained that she does not use the terms "funeral home," "undertaking parlor," "mortuary," "memorial chapel," or any variant of those titles. To the contrary, any family-led death care is done "in partnership with an agreeable funeral director and funeral home." Lauren further noted that she has "taken great care to ensure that disclaimer statements are present on all of [her] print materials and every page of [her] website" that she is not a funeral director and Death Done Differently is not a funeral home.

95.     Additionally, Lauren provided the Attorney General's office with links to the National Home Funeral Association and Green Burial Council websites—organizations within

the death midwifery movement—to better understand Lauren's business and how it was distinct from what funeral directors and funeral homes do.

96.    The case analyst at the Attorney General's office confirmed receipt of Lauren's letter, encouraged her to send over any supplemental documentation that might benefit the office's investigation, and told her that she could later inquire into whether the investigation was ongoing.

97.    Lauren supplemented her own letter with two short letters of support from an Indiana funeral director and a former client, as well as a sample intake form and contract for one of Lauren's clients and a disclosure that she gives to clients. These are attached as Exhibit D.

98.    The funeral director's letter stated that he "found [Lauren's] approach to death and dying refreshing," and described her role in the death care community "as a liaison between hospice caregivers, the family, and the funeral home directors." The funeral director further stated that Lauren does not "interfere with the business of the funeral home," and though her rethinking of death care may be "different and unique," her services always appear "within legal limits."

99.    The former client's letter described the positive experience of working with Lauren for "about a year before" her husband's passing and said that Lauren "was incredibly helpful as a death midwife." Everything Lauren did was within the services listed on her website and consisted of giving advice or the emotional support that any friend or family member could give, including:

  a. Lauren "helped us to understand what our options were";

  b. Lauren "gave us information on who to contact when it comes to funeral homes, cemeteries, lawyers for wills, etc.";

  c. Lauren "helped [the client's dying husband] to write a few letters to family members and friends saying goodbye that were to be passed to them at his funeral"; and

      d.   Lauren "was a shoulder to lean on during that difficult time and continues to be a friend to this day."

100.    The former client chose to have a wake at home in accordance with her family's and her husband's wishes. She emphasized that the family led and performed all of the conduct related to their wake. Lauren "never prepared [the] body in any way that a funeral director might." Instead, Lauren "provided emotional support," "helped to maintain a peaceful environment," and later helped "coordinate . . . aspects of the informal graveside service."

101.    Lauren waited for months to hear back from the Attorney General's office about the complaint it was investigating.

102.    On December 30, 2021, Lauren emailed the case analyst from the Attorney General's office to inquire if the investigation was ongoing, and in that email she attached the sample intake form and contract for one of Lauren's clients, as well as the standard disclosure form that she gives to clients. These materials are included in Exhibit D.

**The Attorney General's Office Seeks And Receives A Cease-and-Desist Order From The Indiana Funeral And Cemetery Board Restricting Lauren's Speech.**

103.    A year after Lauren had last corresponded with the Attorney General's office, the Attorney General filed a motion for a cease-and-desist order (the "Motion") with the Board on January 31, 2023. A copy of the Motion is attached as Exhibit E.

104.    The Board is charged with administering and implementing Indiana's funeral laws and promulgating regulations under them. Ind. Code §§ 25-15-9-8, -9. The Board typically consists of five members, four of which are appointed by the governor. Ind. Code § 25-15-9-2(a)(1). Two Board members must be licensed as funeral directors, two must be active in Indiana's cemetery industry, and one must not be associated with the funeral service industry. Ind. Code §§ 25-15-9-2(a)(2), -3, -4.

105.    The Motion relied on language from Lauren's website at the time of the investigation, and it focused on her activity that is plainly speech. In particular, the Motion

alleged that the following services constitute the unlicensed practice of funeral service (emphasis added for elements that are most plainly speech):

    a. <u>Full End of Life Planning</u>: "*[D]iscussion* of funeral options, body disposition (cremation, traditional burial, or green burial), service choices, etc. and assistance with paperwork such as living will, DNR form, and healthcare power of attorney . . . ."

    b. <u>Facilitation of Community Death Care</u>: "'*[V]erbal guidance* with loved ones under the direct supervision of a licensed funeral director for moving, bathing, dressing, and arrangement of the deceased,' as well as '*consultation* with family in regard to personal information about the family, music and reading selections, religious acknowledgements (if any) and programming.'"

    c. <u>Visits</u>: "*[R]eadings, music, conversation*, healing touch, or general companionship with the dying individual. Responsibilities do not include medical treatments, housekeeping, household chores, or childcare."

    d. <u>Support with Funeral Home</u>: "[A]ccompaniment to funeral home, review of general price list, support with selection of goods and services, presence at funeral service."

106. The Motion, under the heading "Unlicensed Practice," further suggested that Lauren and Death Done Differently were engaging in the practice of funeral service by providing generalized "*advice* to consumers about a range of funeral services, including embalming, burial containers, and body transportation" (emphasis added), under the "Indiana Law" tab of Death Done Differently's website.

107. The Motion concluded that both Lauren and Death Done Differently were each in violation of Ind. Code § 25-15-8-24(b), which—as the Motion explained—"provides that, unless exempted, 'a person that engages in the practice of funeral service without a license . . . commits a Class B infraction.'"

108.    The Motion further stated that Lauren and Death Done Differently were violating this statutory provision because: (1) Lauren did not have a funeral director license, and (2) Death Done Differently did not have a funeral home license.

109.    In the signature block for the Motion, it was signed by Deputy Attorney General Ian Mathew on behalf of himself and Attorney General Todd Rokita.

110.    Lauren was served with the Motion on January 31, 2023.

111.    On May 17, 2023, and in response to the Attorney General's Motion, the Board issued an "Order to Show Cause" (the "Show Cause Order") regarding why Lauren and "Death Done Differently" should not cease and desist their alleged unlicensed practice of funeral service. A copy of the Show Cause Order is attached as Exhibit F.

112.    The Show Cause Order stated that the Board would preside as the administrative law judge of the matter and set a hearing date.

113.    The Show Cause Order named Tracy Hicks, the "Director of the Board," as the point of contact regarding hearing schedules and procedures. The Show Cause Order was signed by Tracy Hicks for Kathleen Matuszak, the Board's Chairperson.

114.    Lauren and Death Done Differently retained counsel to try to resolve the proceeding against her before the Board, and the Board deferred consideration of the Motion.

115.    Even then, Lauren hoped that once the Attorney General's office and the Board gave her case a serious look, it would become clear that there was no sense in applying the funeral-licensing statutes to her educational speech and advice.

116.    To that end, during discussions with the Attorney General's office, Lauren reiterated what she had said before in the materials she had sent in response to the original notice: what her business entailed, that it did not involve conventional funeral-director activities, and that she had a good relationship with existing funeral directors.

117.    Yet the Attorney General's office remained adamant that her services constituted the unlicensed practice of funeral service.

118.     Lauren and the Attorney General's office both participated in a pre-hearing settlement conference on June 27, 2023, with a liaison from the Board (the "Board Liaison")—specifically, Board member Tom Sproles, who is also a licensed funeral director.

119.     At the conference, the Board Liaison—who, again, is one of the four members of the Board itself—agreed with the Attorney General's stark stance. He stated that he believed every service identified in the Motion constituted the practice of funeral service, except for the family visits.

120.     The Board Liaison also stated that he believed that Lauren's general public educational services—speaking to public groups about death rather than counseling a specific client—constituted the practice of funeral service and required a license.

121.     After the conference, the Attorney General's office proposed a cease-and-desist agreement to Lauren and Death Done Differently. With small modifications, Lauren agreed, and the parties jointly proposed it to the Board.

122.     The proposed cease-and-desist was adopted by the Board at a hearing on August 3, 2023, and was reflected in a final order of the Board on August 21, 2023. A copy of the cease-and-desist order (the "Order") is attached as Exhibit G.

123.     The Order reflects the views of the Board and the Attorney General's office that the bulk of Lauren's services, including many of the services that consist of nothing but speaking and writing, requires funeral-director and funeral-home licenses.

124.     In particular, the Board and Attorney General believe that, under Ind. Code § 25-15-8-24(b), to offer their services: (1) Lauren must have a funeral director license, and (2) Death Done Differently must have a funeral home license.

125.     Consistent with the Board Liaison's view, the Board and Attorney General identified three specific categories of Lauren's services (identified from her website) that they believe require a license (emphasis added for elements that are most plainly speech):

    a.   "'Full End of Life Planning: $150-$500,' which includes '***discussion*** of funeral options, body disposition (cremation, traditional burial, or green burial), service choices, etc. and assistance with paperwork such as living will, DNR form, and healthcare power of attorney.'"

    b.   "'Facilitation of Community Death Care: $300-$1,000,' which includes '***verbal guidance*** with loved ones under the direct supervision of a licensed funeral director for moving, bathing, dressing, and arrangement of the deceased,' as well as '***consultation*** with family in regard to personal information about the family, music and reading selections, religious acknowledgements (if any) and programming.'"

    c.   "'Support with Funeral Home: $100-$300,' which includes 'accompaniment to funeral home, review of general price list, support with selection of goods and services, presence at funeral service.'"

126.    The Order also stated that Indiana law requires licenses to "***provide[] advice*** to consumers about a range of funeral services, including embalming, burial containers, and body transportation." (Emphasis added.)

127.    The Order commanded that Lauren and Death Done Differently "shall **IMMEDIATELY** cease to provide the services" identified as requiring a license.

128.    It further included a broad speech prohibition, ordering that Lauren and Death Done Differently "shall refrain from ***counseling*** consumers, whether individually or ***in educational events*** open to the public, in any manner and through any medium, concerning the methods and alternatives for the final disposition of human remains." (Emphases added.)

129.    The Order also required that Lauren and Death Done Differently remove speech from their website and other written materials. Specifically, it commanded that they "shall eliminate" the services identified in the Order "from their website and from any and all advertising materials or business documents."

**On Their Face, Indiana's Funeral-Licensing Laws Restrict Broad Swaths Of Speech.**

130.    The Board and Attorney General's position on the speech-restrictive nature of Indiana's funeral-licensing laws, reflected in the Order, are consistent with Indiana's statutes. The funeral-licensing statutes sweep incredibly broadly and, by their plain language, restrict a wide variety of speech when spoken or written by individuals without funeral licenses.

131.    For instance, Ind. Code § 25-15-2-22 defines the "practice of funeral service"—thereby triggering a requirement for licensure—to capaciously include anything that involves "the application of the principles, methods, and techniques of mortuary science to the delivery of funeral services" or "the counseling of individuals concerning methods and alternatives for the final disposition of human remains," among other things.

132.    Likewise, "funeral services"—which require licensure—is defined broadly to include such things as "counseling of survivors of a deceased individual on . . . the services, methods, and alternatives for final disposition of human remains" and "arranging, supervising, or conducting a funeral service in conjunction with the memorialization or the disposition of human remains." Ind. Code § 25-15-2-17.

133.    In fact, Indiana has a specific list of words that are forbidden for an unlicensed person to use at all in describing her services, including: "funeral service," "funeral directing," "undertaking," "funeral," "funeral arrangement," "embalming," and any "variant of these words." Ind. Code § 25-15-8-23.

134.    Indiana's funeral laws do not provide any exceptions to those in the death care community who, like Lauren, only speak to adults about their death care options, without performing any of the physical acts of a funeral director.

135.    To the best of Plaintiffs' knowledge, Indiana is one of the few states that requires every family to hire a licensed funeral director. Therefore, any of Lauren's clients in Indiana would also have access to a funeral director that they would hire.

136.    Thus, every single one of Lauren's clients retains a funeral director, who can handle the non-expressive activities related to death (like moving the body to a crematory or cemetery) that require licensure.

### Indiana's Enforcement Proceedings Have Devastated Lauren's Business, And There Is No Practical Way For Lauren To Become A Licensed Funeral Director Or For Death Done Differently To Become A Licensed Funeral Home.

137.    Indiana's enforcement proceedings have effectively shuttered Lauren and Death Done Differently's business.

138.    After receiving the Motion, Lauren stopped advising her existing clients and stopped taking on new clients altogether.

139.    Lauren has turned away potential clients and told them that she cannot provide them individualized advice because of the government's enforcement actions.

140.    Likewise, Lauren has turned away individuals interested in her mentorship services because of the government's enforcement actions.

141.    Lauren has further turned down invitations to provide generalized educational lectures because of the government's enforcement actions, including turning down an invitation to present a workshop to a national organization.

142.    In response to the Motion, Lauren removed sections from her website on "Facilitation of Community Death Care" and "Support with Funeral Home."

143.    In response to the subsequent Order, Lauren took down most of the content on her website, including advertising of her individualized-advising services, mentorship services, and ability to provide generalized educational lectures.

144.    In response to the Order, Lauren removed content from her and Death Done Differently's Facebook and Instagram accounts regarding her services.

145.    Because of the Motion and subsequent Order, Lauren could no longer focus on Death Done Differently as a significant job. In part because of this, she got a full-time job at a local non-profit organization in a different field.

146.    It is not feasible for Lauren to revive Death Done Differently's business if that would require her to comply with the Order and obtain funeral-director and funeral-home licenses.

147.    Indiana's funeral-licensing laws—as interpreted by the Board and Attorney General and reflected in the Order—would require Lauren to become a licensed funeral director and Death Done Differently to become a licensed funeral home in order for them to be able to offer their educational and individual-advising services.

148.    In practice, these burdens would be incredibly costly: taking years of time and many tens, if not hundreds, of thousands of dollars.

149.    Start with the funeral-director license Lauren would have to procure. To become a licensed funeral director, an individual must first obtain a funeral director intern license.

150.    To qualify for a funeral director intern license, under Ind. Code. § 25-15-4-2, the applicant must:

    a.  be at least 18-years old;

    b.  not have committed certain acts or crimes that are grounds for denial of licensure;

    c.  possess a high school diploma;

    d.  complete either: (1) 30 semester hours of college level electives and 4 academic quarters at a Board-approved college, school, or department of mortuary science focusing on subjects such as embalming, chemistry, public health, and anatomy, or (2) a 21-month program at a Board-approved college, school, or department of mortuary science focusing on subjects such as embalming, chemistry, public health, and anatomy;

    e.  pay a $25 fee; and

    f.  score at least 75% on a two-part exam concerning funeral service science and funeral service arts (while scoring no less than 70% on either part of the exam and paying a separate $50 fee).

151.    Once a funeral director intern, an individual must obtain a year of experience in the practice of funeral service under the direct supervision of a licensed funeral director. Under 832 Ind. Admin. Code 3-2-1, this internship must entail:

   a.   at least 1,500 hours of work in a funeral home under the direction supervision of a licensed funeral director;

   b.   assisting in the embalming of at least 24 bodies;

   c.   assisting in the arrangement, services, and disposition of at least 24 bodies; and

   d.   submitting four quarterly case reports to the Board detailing the intern's practice of funeral service, including but not limited to embalming, preparing death certificates, and arranging funeral services.

152.    Following completion of the one-year internship, an individual may apply for a funeral director license. The qualifications for this license are the same as the funeral director intern license, except the requisite fee is $50 and the applicant must complete the one-year internship and score at least 75% on a separate licensure exam (along with a separate $50 fee). Ind. Code. § 25-15-4-3; 832 Ind. Admin Code 3-2-2.

153.    Once a licensed funeral director, an individual must complete at least 10 hours of continuing education every two years. Ind. Code § 25-15-6-5(a). The courses must come from board-approved groups like the Indiana Funeral Directors Association. 832 Ind. Admin. Code 4-1-1, -2, -3.

154.    In practice then, for Lauren to become a funeral director she would, at minimum, have to: take four academic quarters of classes at a mortuary school; work full-time for a year as a funeral-director intern, including doing things like embalming two dozen bodies that have no connection at all to her actual work; pay hundreds of dollars in fees; and pass two exams.

155.    Turning to the funeral-home license Death Done Differently must acquire, a "funeral home" must be a physical structure for the storing, embalming, disposing, and viewing of human remains (as part of a funeral service). Ind. Code § 25-15-2-15.

156.    A funeral home must contain "a fully functional embalming room" suitable for embalming bodies, even though Lauren does not do any embalming. Ind. Code § 25-15-2-15; 832 Ind. Admin. Code 5-1-4.

157.    To obtain a funeral home license, an applicant must pay a $50 fee, disclose certain information to the Board, and operate a physical structure that comports with the Board's rules. The Board's rules include inspections, recordkeeping requirements, plumbing requirements, embalming room requirements, and embalmer- and funeral-director-employment requirements. 832 Ind. Admin. Code 5-1-0.5 *et seq.*

158.    In short, Lauren would have to pay tens or hundreds of thousands of dollars to acquire an existing funeral home or build one—a funeral home that she would never have reason to use for her business.

159.    Lauren is not a funeral director, does not want to be a funeral director, and does not need the knowledge or skills of a funeral director to be a death doula or community death care advocate. The time and expense of obtaining superfluous funeral-director training and a license is an immense, pointless, and unrealistic burden.

160.    Death Done Differently is not a funeral home, does not want to be a funeral home, and does not require the physical structure and equipment of a funeral home to provide death doula services. The time and expense of obtaining a superfluous building and funeral home license is an immense, pointless, and unrealistic burden to a small, one-owner company.

161.    Lauren and Death Done Differently cannot afford the time and expenses involved in becoming licensed as a funeral director and funeral home. If they are required to obtain these licenses, Lauren will simply not be able to offer her educational and advising services.

**INJURY TO PLAINTIFFS**

162.    Because of Defendants' enforcement actions, Lauren has been forced to dramatically curtail the activities of Death Done Differently and to stop accepting new clients for her individualized-advising services.

163.    Because of Defendants' enforcement actions, Lauren and Death Done Differently have had to stop advising clients, including an existing client with a cancer diagnosis.

164.    Because of Defendants' enforcement actions, Lauren and Death Done Differently have had to turn away potential clients and tell them she cannot provide them with individualized advice.

165.    Because of Defendants' enforcement actions, Lauren and Death Done Differently have turned away individuals interested in their mentorship services.

166.    Because of Defendants' enforcement actions, Lauren and Death Done Differently have turned down opportunities to provide generalized educational lectures to larger groups.

167.    Because of Defendants' enforcement actions, Lauren and Death Done Differently removed advertising of their individualized-advising services, mentorship services, and ability to provide generalized educational lectures from their website.

168.    Because of Defendants' enforcement actions, Lauren and Death Done Differently have removed content from their Facebook and Instagram accounts regarding the services they used to offer before the Board's Order.

169.    Defendants' enforcement actions have prevented Lauren from pursuing her life mission to help people prepare for and deal with death.

170.    Defendants' enforcement actions have silenced and chilled Lauren and Death Done Differently's pure speech. They were forced to stop giving people individualized advice about death, writing letters to loved ones, and providing guidance about home funerals or other alternatives to conventional funerals.

171.    Because of Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently are constantly concerned that a person facing his or her last moments will die, wanting their advice and assistance, without having an opportunity to consult with them regarding death care.

172.    Because of Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently are faced with the unnecessary costs and burden of licensure.

173.    Lauren and Death Done Differently fear destruction of their business and their efforts to educate and advise others of their death care options, as well as their efforts to tackle the "death-phobic culture," given the Order to cease their activities to comply with the Board's application of Indiana's funeral laws and regulations against them.

174.    Defendants' enforcement actions have caused financial injury to Lauren by forcing her to terminate a significant source of income. She got a new job, in a different field, in part to replace that income.

175.    Indeed, because of Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren is faced with the real possibility that she will be forced to close Death Done Differently for lack of business and resources.

176.    But for the Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently would not fear the Board's future enforcement efforts and fines.

177.    But for the Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently would not have to choose between helping the families who need them and risking enforcement and fines.

178.    But for the Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently would resume providing individualized death care planning.

179.    But for the Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently would resume speaking with families after the death of a loved one to provide them with the guidance, support, and assistance they want at that important time.

180.    But for the Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently would resume providing guidance to a family performing its own home funeral after a death has occurred.

181.    But for the Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently would not decline future opportunities to provide mentorship to others who are interested in learning more about or becoming themselves professionally involved in the death care movement.

182.    But for the Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently would resume providing educational lectures about death care.

183.    But for the Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently would not lose future revenue, whether fees or donations, as a result of declining to provide individualized and general advice regarding death care.

184.    But for the Defendants' application and enforcement of Indiana's funeral laws and regulations, Lauren and Death Done Differently would not face the immense, pointless, and unrealistic burdens of obtaining licensure in order to continue their roles within the death care community and the movement rethinking death care.

185.    The Defendants' application and enforcement of Indiana's funeral laws and regulations against Lauren and Death Done Differently has had a chilling effect on their speech and activities due to fear of enforcement and fines.

## CONSTITUTIONAL VIOLATIONS

### COUNT I
### 42 U.S.C. § 1983 – First Amendment

186.    Paragraphs 1 through 185 are incorporated as though fully set forth herein.

187.    Plaintiffs Lauren and Death Done Differently's advice and counseling of adults regarding death care is pure speech, not a form of occupational conduct.

188.    The First Amendment's Free Speech Clause fully protects Plaintiffs Lauren and Death Done Differently's speech regarding death care, whether that speech is in the form of one-on-one consultations, educational lectures, or comments about Indiana's funeral laws on a website. The First Amendment's protection does not hinge on whether Plaintiffs receive a fee for their advice.

189.    By enforcing Indiana's funeral laws against Lauren's and Death Done Differently's listed services, Defendants are engaged in the content-based regulation of pure speech.

190.    Defendants lack even a substantial interest, much less a compelling one, in preventing laypeople like Lauren from sharing important and useful knowledge about death care with interested adults.

191.    Even if a substantial or compelling interest existed—which it does not—it is not the least restrictive alternative to accomplish that interest to require Lauren to obtain a funeral director license and Death Done Differently to obtain a funeral home license to speak with adults about death care. In fact, it is not tailored in any way.

192.    Not only are there less restrictive alternatives to a total speech ban, Indiana has not attempted any less restrictive alternative to determine if a less speech-restrictive option would address any government interest supposedly advanced by the ban.

193.    By suppressing Plaintiffs' fully protected speech, Defendants are inflicting an ongoing irreparable harm on them.

194.    Defendants' enforcement of the challenged statutes, regulations, policies, and practices to suppress Plaintiffs' speech rights cannot withstand any level of First Amendment scrutiny.

## COUNT II
### 42 U.S.C. § 1983 – First Amendment

195.    Paragraphs 1 through 194 are incorporated as though fully set forth herein.

196.    Plaintiffs Lauren and Death Done Differently's advice and counseling of adults regarding death care is protected speech.

197.    The First Amendment's Free Speech Clause protects Plaintiffs Lauren and Death Done Differently's right to advertise that they provide both individualized advice and generalized education regarding death care.

198.    Plaintiffs Lauren and Death Done Differently's advertising is speech protected under the First Amendment.

199.    Plaintiffs Lauren and Death Done Differently's advertisements concern lawful activity, are truthful, and are not misleading.

200.    Lauren does not advertise that she is a licensed funeral director. Death Done Differently does not advertise that it is a licensed funeral home.

201.    Defendants do not have a consumer-protection interest—or any other legitimate interest—in prohibiting truthful, non-misleading advertisements concerning lawful activity.

202.    Defendants do not have a valid interest in banning Plaintiffs' advertisements for their individualized consulting about death care.

203.    Even if Defendants have a valid interest in banning Plaintiffs' truthful, non-misleading advertisements—which they do not—then ordering Plaintiffs to cease all online discussions of Indiana's funeral laws is not reasonably tailored to that interest.

204.    By suppressing Plaintiffs' fully protected speech, Defendants are inflicting an ongoing irreparable harm on them.

205.    Defendants' enforcement of the challenged statutes, regulations, policies, and practices to suppress Plaintiffs' speech rights cannot withstand any level of First Amendment scrutiny.

## REQUEST FOR RELIEF

Plaintiffs respectfully request the following relief:

A.    A declaration that Defendants' enforcement of Indiana's funeral statutes and regulations violates the First Amendment as applied to Plaintiffs;

B.    Preliminary and permanent injunctions enjoining future enforcement of Indiana's funeral laws and regulations as applied to Plaintiffs in violation of the First Amendment;

C.    Attorneys' fees and costs; and

D.    Any other relief that the Court deems appropriate.

RESPECTFULLY SUBMITTED this 30th day of August 2023.

Stephen J. Peters (IN Bar No. 6345-49)
David I. Rubin (IN Bar. No. 22525-53)
Erika Steuerwald (IN Bar No. 34044-49)
KROGER GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
(317) 692-9000
speters@kgrlaw.com
drubin@kgrlaw.com
esteuerwald@kgrlaw.com

/s/ Benjamin A. Field
Benjamin A. Field (DC Bar No. 1046902)
Christian Lansinger (MD Bar No. 2211290007)
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, Virginia 22203
(703) 682-9320
bfield@ij.org
clansinger@ij.org

Jeff Rowes (TX Bar No. 24104956)
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 960
Austin, TX 78701
(512) 480-5936
jrowes@ij.org

*Counsel for Plaintiffs Lauren Richwine and Death Done Differently LLC*

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | |
|---|---|
| LAUREN RICHWINE and DEATH DONE DIFFERENTLY LLC, | Case No._____ |
| *Plaintiffs*, | |
| v. | |
| KATHLEEN DIANE MATUSZAK, THOMAS SPROLES, FRANK DOWNING, and CHRISTOPHER COOKE, in their official capacities as members of the Indiana State Board of Funeral & Cemetery Service; THEODORE ROKITA, in his official capacity as Attorney General of Indiana; and LINDSAY HYER, in her official capacity as Executive Director of the Indiana Professional Licensing Agency, | |
| *Defendants*. | |

**VERIFICATION OF PLAINTIFF LAUREN RICHWINE**

I, Lauren Richwine, declare as follows:

1.    I am a Plaintiff in the above-captioned civil action.

2.    I have read the foregoing complaint and know the contents thereof.

3.    The facts contained in this complaint, specifically those set forth in paragraphs 1–3, 8–9, and 13–185, are true and correct to my own knowledge.

4.    The statements of law in those paragraphs accurately reflect my understanding of Indiana's funeral laws and regulations.

5.    All exhibits referenced in and attached to this complaint are true and correct to my own knowledge.

6.    If called upon, I would competently testify as to these facts and my knowledge.


I declare under penalty of perjury that the foregoing is true and correct.


Executed on August 30th, 2023.


Lauren Richwine