**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | |
|---|---|
| LAUREN RICHWINE and DEATH DONE DIFFERENTLY LLC, <br><br> *Plaintiffs*, <br><br> v. <br><br> KATHLEEN DIANE MATUSZAK, THOMAS SPROLES, FRANK DOWNING, and CHRISTOPHER COOKE, in their official capacities as members of the Indiana State Board of Funeral & Cemetery Service; THEODORE ROKITA, in his official capacity as Attorney General of Indiana; and LINDSAY HYER, in her official capacity as Executive Director of the Indiana Professional Licensing Agency, <br><br> *Defendants.* | Case No. 1:23-cv-370 |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................. 1

STATEMENT OF THE FACTS ............................................................................................ 2

    I.    FACTUAL BACKGROUND ............................................................................................ 2

            A.    Lauren and Her Business, Death Done Differently, Provide Education And Individualized Advice About Planning For Death ............................................ 2

            B.    Plaintiffs Also Engage In Commercial Speech To Promote Their Work And Business ................................................................................................... 5

            C.    Defendants Prohibit Lauren And Death Done Differently's Educational And Individual-Advising Services By Ordering Them To Cease Speaking Until They Obtain Funeral-Director And Funeral-Home Licenses .................. 6

            D.    The Burdens Of Licensure Are Impossible For Plaintiffs To Satisfy And Serve No Public Benefit ................................................................................... 9

    II.    PROCEDURAL BACKGROUND .................................................................................... 11

LEGAL STANDARD ........................................................................................................... 11

ARGUMENT ........................................................................................................................ 12

    I.    DEFENDANTS' ENFORCEMENT OF INDIANA'S FUNERAL-LICENSING SCHEME LIKELY VIOLATES THE FIRST AMENDMENT, BOTH AS A CONTENT-BASED RESTRICTION ON FULLY PROTECTED SPEECH AND AS A RESTRICTION ON COMMERCIAL SPEECH ......... 12

            A.    Forbidding Plaintiffs From Providing Education And Individualized Advice About End-Of-Life Care Likely Fails Any Level of First Amendment Scrutiny ................................................................................... 13

                    1.    Defendants' application of Indiana's funeral-licensing scheme to restrict Plaintiffs' ability to educate and give individualized end-of-life advice is a content-based restriction on speech ......................................... 13

                    2.    Defendants are unlikely to satisfy strict scrutiny ...................................... 16

                    3.    Defendants' speech restrictions are unlikely to satisfy any level of scrutiny ................................................................................................... 20

B.  Forbidding Plaintiffs From Truthfully Advertising Their Educational And Individualized-Advice Services Likely Fails The *Central Hudson* Test For Restrictions On Commercial Speech ............................................................21

1.  Plaintiffs' advertising is entitled to First Amendment protection because the education and advice they provide is lawful to give ..............21

2.  Plaintiffs are likely to prevail on their commercial-speech claim because Defendants cannot establish that a complete advertising prohibition is tailored to directly advancing any important interest .........22

II.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM TO THEIR ABILITY TO GIVE INDIVIDUALIZED ADVICE AND TO ADVERTISE THAT ADVICE IF THE COURT DOES NOT GRANT PRELIMINARY RELIEF ...............................................................................23

III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION .......................................................................................................24

CONCLUSION ....................................................................................................................25

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996) ........................................................................... 17

*ACLU of Ill. v. Alvarez*,
679 F.3d 583 (7th Cir. 2012) ...................................................... 20, 24

*Ams. for Prosperity Found. v. Bonta*,
141 S. Ct. 2373 (2021) ...................................................................... 19

*Ashcroft v. ACLU*,
542 U.S. 656 (2004) ............................................................ 11–12, 19

*Billups v. City of Charleston*,
961 F.3d 673 (4th Cir. 2020) ...................................................... 15, 20

*Brown v. Ent. Merchants Ass'n*,
564 U.S. 786 (2011) .......................................................................... 16

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ...................................................................... 21, 22

*Christian Legal Soc'y v. Walker*,
453 F.3d 853 (7th Cir. 2006) ........................................................... 24

*Edenfield v. Fane*,
507 U.S. 761 (1993) ...................................................................... 20, 22

*Elrod v. Burns*,
427 U.S. 347 (1976) .......................................................................... 23

*Ent. Software Ass'n v. Blagojevich*,
469 F.3d 641 (7th Cir. 2006) ........................................................... 17

*FCC v. League of Women Voters of Calif.*,
468 U.S. 364 (1984) .......................................................................... 13

*First Nat'l Bank of Boston v. Bellotti*,
435 U.S. 765 (1978) .......................................................................... 16

*Full Circle of Living & Dying v. Sanchez*,
No. 2:20-cv-01306-KJM-KJN, 2020 WL 7714200 (E.D. Cal. Dec. 29, 2020) ................. *passim*

*Full Circle of Living & Dying v. Sanchez*,
No. 2:20-cv-01306-KJM-KJN, 2023 WL 373681 (E.D. Cal. Jan. 24, 2023) .......... 2, 13, 22, 23

*Higher Soc'y of Indiana v. Tippecanoe Cnty.*,
   858 F.3d 1113 (7th Cir. 2017) ........................................... 23, 24

*Hines v. Quillivan*,
   982 F.3d 266 (5th Cir. 2020) ............................................. 15

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) .......................................................... 14, 16

*Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*,
   56 F.4th 437 (7th Cir. 2022) ........................................... 23

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009 ........................................... 23

*Korte v. Sebelius*,
   735 F.3d 654 (7th Cir. 2013) ........................................... 12, 24

*McCullen v. Coakley*,
   573 U.S. 464 (2014) ...................................................... 13, 20

*National Institute of Family & Life Advocates v. Becerra (NIFLA)*,
   138 S. Ct. 2361 (2018) ................................................... 15, 20

*Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*,
   961 F.3d 1062 (9th Cir. 2020) ......................................... 15

*Pagan v. Fruchey*,
   492 F.3d 766 (6th Cir. 2007) ........................................... 22

*Perry v. Loc. Lodge 2569 of Int'l Ass'n of Machinists & Aerospace Workers*,
   708 F.2d 1258 (7th Cir. 1983) ......................................... 17

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ...................................................... 16

*Reed v. Town of Gilbert*,
   576 U.S. 155 (2015) ...................................................... 13, 16

*Riley v. Nat'l Fed'n of the Blind of N. Carolina, Inc.*,
   487 U.S. 781 (1988) ...................................................... 18

*Sanders Cnty. Republican Cent. Comm. v. Bullock*,
   698 F.3d 741 (9th Cir. 2012) ........................................... 24

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ...................................................... 14, 20

*Turner Broad. Sys., Inc. v. FCC*,
   512 U.S. 622 (1994) ...................................................... 20

*United States v. Alvarez*,
    567 U.S. 709 (2012) ................................................................. 19

*United States v. Playboy Ent. Grp., Inc.*,
    529 U.S. 803 (2000) ................................................................. 13

*Vill. of Schaumburg v. Citizens for a Better Env't*,
    444 U.S. 620 (1980) ................................................................. 19

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) ............................................................ 17, 22

*Vizaline, L.L.C. v. Tracy*,
    949 F.3d 927 (5th Cir. 2020) ................................................. 15

*Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*,
    536 U.S. 150 (2002) ................................................................. 18

*Williams-Yulee v. Fla. Bar*,
    575 U.S. 433 (2015) ................................................................. 16

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ..................................................................... 11

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) ............................................. 15

*Worrell Newspapers of Indiana, Inc. v. Westhafer*,
    739 F.2d 1219 (7th Cir. 1984) ............................................... 16

## STATUTES AND REGULATIONS

42 U.S.C. § 1983 ......................................................................... 11

832 Ind. Admin. Code 3-2-1 ................................................ 10, 18

832 Ind. Admin. Code 5-1-0.5 ............................................. 10, 18

Ind. Code § 25-15-2-15 ........................................................ 10, 18

Ind. Code § 25-15-2-17 .......................................................... 8, 14

Ind. Code § 25-15-2-22 .......................................................... 8, 14

Ind. Code §§ 25-15-4-2 ........................................................ 10, 18

Ind. Code § 25-15-8-23 .......................................................... 8, 23

Ind. Code § 25-15-8-24(b) ...................................................... 7, 8

**INTRODUCTION**

Lauren Richwine speaks with people about a difficult topic, one we often wish to avoid: death and dying. She gives individualized advice to clients and their families to help them plan for the final days of life, options for funeral goods and services, and how they would like to be remembered. Lauren does not arrange funerals or sell funeral merchandise. She just helps clients learn and talk through what is important to them. Though Lauren is not a funeral director and is not trying to supplant funeral directors, Defendants—officials of the State of Indiana—have ordered Lauren to stop speaking unless she obtains ruinously onerous funeral licenses: a funeral-director license for her and a funeral-home license for her business. As applied, that order acts as a prohibition on Lauren's speech. Such a plain First Amendment violation warrants a preliminary injunction to restore Plaintiffs' free-speech rights for the duration of this case.

Defendants have demanded that Plaintiffs get licenses to speak based entirely on the *topics* they discuss, such as "funeral options," "methods and alternatives for the final disposition of human remains," or "programming" a memorial. That is a content-based speech regulation and triggers strict First Amendment scrutiny, which Defendants cannot hope to satisfy. Forbidding Lauren from giving truthful advice to families serves no compelling interest. And even if there were some such interest, the conditions Defendants have imposed are far from narrowly tailored: They are demanding that Lauren spend a year training for a profession she does not practice and to buy a full-fledged funeral home she would never use. Defendants are thus likely to fail strict scrutiny, and Plaintiffs are likely to prevail on the merits.

The non-merits factors for a preliminary injunction follow naturally. It is always an irreparable injury to quash free-speech rights and never in the public interest for the government to violate constitutional rights. That is especially true in this case, where Defendants' demands to get licenses to speak have already muzzled Lauren's speech and put her business in stasis.

In fact, when a federal district court confronted materially identical First Amendment claims about giving end-of-life advice in California, that court issued a preliminary injunction (which later became permanent). *See Full Circle of Living & Dying v. Sanchez*, No. 2:20-cv-01306-KJM-KJN, 2020 WL 7714200, at *5–7 (E.D. Cal. Dec. 29, 2020) (preliminary injunction); *Full Circle of Living & Dying v. Sanchez*, No. 2:20-cv-01306-KJM-KJN, 2023 WL 373681, at *17–22 (E.D. Cal. Jan. 24, 2023) (permanent injunction). This Court should do the same, so that Lauren may resume exercising her constitutional speech rights while this case is litigated.

## STATEMENT OF THE FACTS

### I. FACTUAL BACKGROUND

#### A. Lauren And Her Business, Death Done Differently, Provide Education And Individualized Advice About Planning For Death.

Plaintiff Lauren Richwine is part of a national movement rethinking how Americans approach death. *See* Verified Complaint ("Compl.") ¶ 13. What most now think of as a conventional funeral—involving embalming the body, holding a ceremony in a funeral parlor, and cremation or burial in an expensive casket—is a historically recent development. *Id.* ¶ 19. In addition, the conventional system often medicalizes death, making it the province of hospitals and hospice, without creating an emotionally supportive space for a dying person and their family to consider how they wish to approach death and to be remembered. *Id.* ¶ 20.

That is where "death doulas" or "death midwives"—like birth doulas or midwives, but for the end of life—come into the picture. They seek to fill that gap and to help the dying and their families approach death in a personalized manner and to choose what best reflects their beliefs and wishes. *Id.* ¶¶ 21–23. Death doulas provide education in their community to inform people about their many options about death, and they work with families to make individualized

plans. *Id.* ¶¶ 15, 40–41, 43, 53–56. This includes discussing options for directing death care, like medical directives. *Id.* ¶ 23. It includes discussing alternatives for being remembered, ranging from conventional funerals to home funerals conducted by the family at home (like a Catholic wake) that are safe and legal in all 50 states. *Id.* ¶¶ 16, 24. And it includes discussing options for disposition of remains, which could be a traditional casket burial, but might instead be environmentally conscious options (such as green burials) that are growing in popularity. *Id.* ¶ 15.

This work is exactly what Lauren does, which she describes as being a "community death care advocate." *Id.* ¶¶ 1, 15. Lauren became interested in end-of-life care while working as a hospice volunteer in 2016, where she identified gaps in the continuum of care from diagnosis to death. *Id.* ¶¶ 26–27. She was troubled by what she saw as a "death-phobic culture" in which people did not engage in difficult but important conversations about death to plan how they wish to approach death and their wishes for after death. *Id.* ¶ 28. Lauren began reading about death care, attending programs and in-person mentorships, speaking with licensed funeral directors, and joining the leading national organizations for death doulas and death midwives. *Id.* ¶¶ 31, 33. She became a trained facilitator in a "Respecting Choice Advance Care Planning" Program to help patients make personal plans to direct their healthcare and end-of-life decisions. *Id.* ¶ 32.

In 2019, Lauren made this a vocation and founded a business: her co-Plaintiff Death Done Differently LLC ("Death Done Differently"). *Id.* ¶ 35. Through Death Done Differently, Lauren offers a variety of death-doula and death-advocate services, which consist fundamentally of speech. *Id.* ¶¶ 39–40, 42. She offers individualized advising and planning, helping clients and their families to develop end-of-life plans covering topics such as funeral options, options for body disposition, and choices for remembrance services. *Id.* ¶ 41(b). She will facilitate

conversations with clients and their families about their desired levels of medical intervention in the case of sudden accidents or worsening medical conditions, and she assists families with related paperwork such as a living will, medical directive, and healthcare power of attorney. *Id.* ¶ 41(c). For remembrance services, she offers to consult as a celebrant, to discuss how a client wishes to be remembered, and to coordinate music, readings, religious acknowledgments, and other programming. *Id.* ¶ 41(d). Lauren will visit with clients and their families as they approach death to provide emotional support, including reading, playing music, having conversations, and providing healing touch and companionship. *Id.* ¶ 41(e). She teaches families concepts and skills for processing grief in a healthy fashion and how best to support those most intimately affected by a death. *Id.* ¶ 45. And Lauren, who has a bachelor's degree in creative writing, also offers to help clients craft letters to loved ones and ensure that they get to the intended recipients. *Id.* ¶ 41(g). Lauren will also provide emotional support and planning for the loss of a family pet. *Id.* ¶ 52. And in addition to providing these individualized advice and planning services, Lauren offers educational programs to the community to discuss these end-of-life topics, and she mentors others who want to become death doulas themselves. *Id.* ¶¶ 53–56.

Lauren is very clear about what she does and does not do. She described her services on her website with transparent pricing, and she has been just as clear during initial consultations with clients. *Id.* ¶ 41(a); *see also generally id.* Ex. A. She stated plainly on her website and at in-person consultations that she is ***not*** a licensed funeral director. *Id.* ¶¶ 34, 59 & Ex. A. And Lauren does ***not*** do any of the specialized and technical tasks that funeral directors or embalmers (or doctors, estate lawyers, or financial advisors) do. *Id.* ¶¶ 46, 58, 65, 69. She does not provide medical care; she does not transport, store, or take custody of human remains; she does not embalm, cremate, or bury remains; she does not accept money in trust for future purchases of

goods and services; and she does not advise families about technical and medical matters beyond the scope of layperson knowledge. *Id.* ¶¶ 51, 57. Lauren also does not push families to pursue any particular option—whether a conventional funeral or alternative options—but rather helps families understand their options and choose what is right for them. *Id.* ¶¶ 1, 15, 51(g).

Not only does Lauren not do the technical tasks of funeral directors, she has good relationships with licensed funeral directors in her community who share her open-minded attitude to death. *Id.* ¶ 49. And because Indiana requires every family experiencing a death to hire a funeral director, Lauren's services are necessarily complementary to funeral directors' because Lauren's clients always have the services of funeral directors, too. *Id.* ¶¶ 63–64.

**B.    Plaintiffs Also Engage In Commercial Speech To Promote Their Work And Business.**

Lauren speaks and writes in her vocation as a community death advocate, but she and Death Done Differently also engage in commercial speech to inform the public about their services. Compl. ¶ 41. Death Done Differently has maintained a website that accurately describes what Lauren says and does, and how to retain her services. *Id.*; *see id.* Ex. A. For example, the website has explained:

- Lauren offers "Full End of Life Planning," which includes: "Discussion of funeral options, body disposition (cremation, traditional burial, or green burial), service choices, etc. and assistance with paperwork such as living will, DNR form, and healthcare power of attorney."

- Lauren offers "Support for Family Led Death Care": "Consultation as a celebrant with family in regard to personal information, music and reading selections, religious acknowledgements (if any) and programming. Conversations prior to death about preferences for post death care and life review."

*Id.* ¶ 41 & Ex. A at 11. Every page on the website has had a footer explicitly stating that "Death Done Differently is an educational consulting organization and is in no way considered a funeral establishment," and the FAQ page explained expressly that Lauren does ***not*** perform the services of a funeral director. *Id.* ¶¶ 59(a)–(b) & Ex. A at 6 (FAQ), 1–12 (footer on every page).

### C. Defendants Prohibit Lauren And Death Done Differently's Educational And Individual-Advising Services By Ordering Them To Cease Speaking Until They Obtain Funeral-Director And Funeral-Home Licenses.

By 2021, Lauren's work through Death Done Differently was thriving, providing valuable services to many members of the community. Compl. ¶ 84. It had become Lauren's occupation that took up most of her working time and was becoming a significant source of her income. *Id.* As remains true to this day, no clients ever complained about the quality of Lauren's end-of-life guidance services, and none were confused about the fact that she did not have a funeral-director or funeral-home license. *Id.* ¶¶ 37–38. And no consumers had complained to Indiana authorities about Lauren. *Id.* ¶ 83.

But at the end of June 2021, Lauren and Death Done Differently received a notice from the Indiana Attorney General's office informing her that the Indiana Professional Licensing Agency ("IPLA") had received a complaint from an anonymous source alleging that Death Done Differently "may require a license from the state to provide funeral services." *Id.* ¶¶ 85, 88–90 & Ex. B. The complaint did ***not*** allege that Lauren had harmed any consumer or that any consumer was confused, and Lauren was informed that the complaint did not come from a consumer. *Id.* ¶¶ 85, 88 & Ex. B at 15. The IPLA requested an "investigation and a 'Cease and Desist'" under several provisions of the Indiana funeral-licensing laws. *Id.* ¶ 86 & Ex. B at 15.

Lauren thought that this must be a mistake because, as she saw it, she did not do the work of a funeral director or funeral home. *Id.* ¶ 91. She sent a letter to the Attorney General's office explaining Death Done Differently's business, why it is different from funeral-directing, and that

she is careful to make clear she is not a funeral director or funeral home. *Id.* ¶¶ 92–95 & Ex. C. Lauren also sent a letter from a licensed Indiana funeral director who supported her work, as well as a client testimonial explaining Lauren's services and how "incredibly helpful" Lauren had been "as a death midwife" in helping the family "understand what our options were," to "write a few letters to family members and friend saying goodbye," and supporting the family emotionally at the time of death and at the memorial services. *Id.* ¶¶ 97–100 & Ex. D at 18–20.

But in January of this year, the Attorney General's office filed a motion for a cease-and-desist order (the "C&D Motion") with the Indiana State Board of Funeral and Cemetery Service (the "Board"). *Id.* ¶ 103 & Ex. E. The C&D Motion lasered in on Lauren's speech, identifying services from Death Done Differently's website that comprise pure speech, including "[d]iscussion of" end of life options, "[v]erbal guidance" and "consultation[s]" about death care and memorial programming, "[r]eadings, music, conversation" during end-of-life visits, and providing "advice to consumers about a range of funeral services." *Id.* ¶¶ 105–06 & Ex. E at 27–28 ¶¶ 13–14. The C&D Motion alleged that Lauren needed to have a funeral-director license and that Death Done Differently needed a funeral-home license to offer these services, and that without such licenses they were violating Indiana's funeral-licensed laws, specifically Indiana Code § 25-15-8-24(b). *Id.* ¶¶ 107–08 & Ex. E at 28–29 ¶¶ 18–19. In response to the C&D Motion, in May the Board issued an order to show cause why a cease-and-desist order should not issue. *Id.* ¶ 111 & Ex. F.

Even at this point, Lauren hoped that this was all a mistake and that when the Attorney General's office and the Board fully understood her work, they would see it made little practical sense to apply the funeral-licensing statutes to her educational speech and individualized advice. *Id.* ¶ 115. She retained counsel to help her navigate the process and reiterated in communications

with the Attorney General's office that she did not do conventional funeral-director activities and had good relationships with licensed funeral directors. *Id.* ¶¶ 114, 116.

Unfortunately for Lauren, the Attorney General's speech-restrictive position is well-founded in Indiana's broadly written funeral-licensing statutes, which on their face proscribe broad swaths of speech for those without funeral licenses. For instance, Indiana Code § 25-15-2-22 defines the "practice of funeral service"—thereby triggering a requirement for licensure, *see* Ind. Code § 25-15-8-24(b)—to capaciously include anything that involves "the counseling of individuals concerning methods and alternatives for the final disposition of human remains," among other things. Likewise, "funeral services" is defined broadly to include such things as "counseling of survivors of a deceased individual on . . . the services, methods, and alternatives for final disposition of human remains" and "arranging, supervising, or conducting a funeral service in conjunction with the memorialization or the disposition of human remains." Ind. Code § 25-15-2-17. The statutes even have a list of wholly forbidden words for the unlicensed laity to use in describing their services, including "funeral, "funeral service," "funeral arrangement," and any "variant of these words." Ind. Code § 25-15-8-23.

In applying these statutes and pursuing the C&D Motion, the Attorney General's office was adamant that Plaintiffs needed licenses to speak as they wished. Compl. ¶ 117. It soon became clear that the Board agreed. At a conference with Lauren, her attorney, and the enforcing Deputy Attorney General, a liaison from the Board—himself a member of the Board—stated that he thought every service identified by the Attorney General's offices required licenses, except for visits to families. *Id.* ¶¶ 118–19. The Board member even said that Lauren needed licenses to hold general, non-individualized educational events about death care for the public. *Id.* ¶ 120.

That expansive view of Indiana's funeral-licensing statutes was ultimately confirmed when the Board entered a cease-and-desist order (the "Order") on August 21, 2023. *Id.* ¶ 122; *see id.* Ex. G. The Order concluded that most of the services identified in the C&D Motion require funeral-director and funeral-home licenses. *Id.* ¶¶ 123–24 & Ex. G at 42–45 ¶¶ 17–18, 28–29. This included almost all of Lauren's pure speech, including "discussion of funeral options," "verbal guidance" and "consultation" with families about death care, and "providing advice" about choosing funeral services. *Id.* ¶¶ 125–26 & Ex. G at 42–43 ¶¶ 17–18. The Order commanded that Lauren "IMMEDIATELY cease to provide" those communicative services without a license, and further added that she "shall refrain from counseling consumers, whether individually or in educational events open to the public." *Id.* ¶¶ 127–28 & Ex. G at 46. And the Order required that Lauren and Death Done Differently eliminate all references to those communicative services "from their website and from any and all advertising materials or business documents." *Id.* ¶ 129 & Ex. G at 46.

### D. The Burdens Of Licensure Are Impossible For Plaintiffs To Satisfy And Serve No Public Benefit.

The practical effect of the Order is to shut down Death Done Differently and to silence Lauren's speech about death care. *Id.* ¶¶ 137, 170. Indeed, in the wake of the C&D Motion, Lauren stopped taking on new clients for Death Done Differently and stopped providing individualized advice to her existing clients. *Id.* ¶¶ 138–39, 162–64, 170. She also ceased speaking at public educational events and turned down requests to provide mentorship in becoming a death doula. *Id.* ¶¶ 140–41, 165–66. Since the Order was finalized, Lauren has also taken down the proscribed materials on her website and her social media pages. *Id.* ¶¶ 143–44, 167–68.

In sum, because of Defendants' enforcement actions, Death Done Differently has been put in stasis. *Id.* ¶¶ 137, 145, 170, 174. Because she is subject to the Order, Lauren is prohibited from providing both individualized advice and general education about death care. *Id.* ¶¶ 162–66, 170 & Ex. G at 46.

And it is not practicable for Lauren to lift the gag order by obtaining the incredibly burdensome licenses that Defendants demand. *Id.* ¶ 161. Start with the funeral-director license: Under Indiana's statutes and regulations, Lauren would have to attend mortuary school, work full-time for a year as a funeral-director intern doing things like embalming two dozen bodies that have nothing to do with her death counseling, pay hundreds of dollars in fees, and pass two exams. *Id.* ¶¶ 149–54; *see* Ind. Code §§ 25-15-4-2, -3; 832 Ind. Admin. Code 3-2-1. And for Death Done Differently to obtain a funeral-home license would require it to obtain a full-fledged funeral-home structure with a "fully functional embalming room" and comply with the full suite of licensing fees and technical requirements on funeral homes. Compl. ¶¶ 155–57; *see* Ind. Code § 25-15-2-15; 832 Ind. Admin. Code 5-1-0.5 *et seq.* That would all be to own a funeral home that Lauren and Death Done Differently would never use. Compl. ¶ 158. These tremendous costs in time and financial resources are simply not possible for Lauren and Death Done Differently to bear, so the effect of the Order is a permanent gag on her speech. *Id.* ¶¶ 3, 159–61.

Weighed against these impossible burdens on Plaintiffs, there is no corresponding benefit to the public. Lauren and Death Done Differently do not and have never held themselves out as a funeral director or funeral home, and no consumer has ever been confused about that. *Id.* ¶¶ 34, 36–38. They do not do any of the technical things, like embalming or taking possession of human remains, that justify funeral licensure. *Id.* ¶ 57. Thus, the only effect of imposing

Indiana's licensing laws on Plaintiffs is to deprive Lauren's community of the truthful advice and support she wishes to offer and which her clients have found so valuable. *Id.* ¶¶ 190, 201.

## II.    PROCEDURAL BACKGROUND

With the entry of the Order on August 21, 2023, Lauren and Death Done Differently are now laboring under a prior restraint on their speech. The Order commanded them to "immediately cease" providing the communicative services described and to "refrain from counseling consumers . . . in any manner and through any medium." Compl. ¶¶ 127–28 & Ex. G at 43; *see supra* p. 9. The Order is "a final disposition" reflecting Defendants' considered views of what Indiana's laws require. Compl. Ex. G at 47.

Plaintiffs have thus promptly turned to this Court to protect their free-speech rights by filing a verified complaint under 42 U.S.C. § 1983, raising First Amendment claims that Defendants are violating Plaintiffs' rights to provide individualized advice and educational speech, as well as their commercial-speech rights to advertise those services. Compl. ¶¶ 3, 186–205. Plaintiffs move here for a preliminary injunction to permit them to exercise their First Amendment free-speech rights while this case is litigated.

## LEGAL STANDARD

A preliminary-injunction motion is governed by the familiar four-part test: a plaintiff must show (1) she "is likely to succeed on the merits, (2) she "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in h[er] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In a First Amendment case like this, heightened constitutional scrutiny means that the government bears the burden of proof to justify its speech restriction, and thus the government bears the burden to prove that the preliminary injunction should *not* be granted because the government is likely to satisfy heightened scrutiny. *See Ashcroft v. ACLU*, 542 U.S. 656, 666

(2004) ("As the Government bears the burden of proof on the ultimate question . . . , [plaintiffs] must be deemed likely to prevail unless the Government has shown that [plaintiffs'] proposed less restrictive alternatives are less effective than" the challenged regulation.); *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (To defeat preliminary injunction, "the government must discharge its burden of justifying [the challenged regulation] under strict scrutiny.").

## ARGUMENT

I. **DEFENDANTS' ENFORCEMENT OF INDIANA'S FUNERAL-LICENSING SCHEME LIKELY VIOLATES THE FIRST AMENDMENT, BOTH AS A CONTENT-BASED RESTRICTION ON FULLY PROTECTED SPEECH AND AS A RESTRICTION ON COMMERCIAL SPEECH.**

Plaintiffs are likely to prevail on both of their First Amendment claims. First, requiring funeral-director and funeral-home licenses as a condition of speaking about death planning is a content-based restriction on speech that likely fails strict scrutiny (or any other form of First Amendment scrutiny). Second, if Plaintiffs are likely to prevail on their claim about providing educational speech and individualized advice, then Defendants' restriction on their truthful advertising about those services likely fails the *Central Hudson* test for regulations of commercial speech.

In fact, a federal district court in California has already laid out the roadmap. It ruled in favor of materially identical First Amendment claims brought by death doulas who also faced a demand from state funeral-licensing authorities to get funeral-director and funeral-home licenses in order to speak about end-of-life care and home funerals. They brought First Amendment claims (among others), premised on the same legal principles as here, to vindicate their speech rights to provide education and individualized advice about death. That district court issued a preliminary injunction in the plaintiffs' favor shortly after the case was filed, applying heightened First Amendment scrutiny and finding that the government failed it. *See Full Circle of Living & Dying*, 2020 WL 7714200, at *5–7. At summary judgment, the plaintiffs again

prevailed under heightened First Amendment scrutiny, and the injunction was made permanent. *See Full Circle of Living & Dying*, 2023 WL 373681, at *17–22. The facts and law for Plaintiffs' claims here are materially identical, and the same result should obtain for the reasons that follow.

**A.      Forbidding Plaintiffs From Providing Education And Individualized Advice About End-Of-Life Care Likely Fails Any Level Of First Amendment Scrutiny.**

"[C]ontent-based restrictions on speech . . . can stand only if they survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015) (internal quotation marks omitted). This is a demanding test, and so "[i]t is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 818 (2000). Here, Defendants' application of Indiana's funeral-licensing laws is a content-based restriction on Plaintiffs' speech, and it fails strict scrutiny because it neither serves a compelling interest nor is it narrowly tailored.

**1.      Defendants' application of Indiana's funeral-licensing scheme to restrict Plaintiffs' ability to educate and give individualized end-of-life advice is a content-based restriction on speech.**

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed*, 576 U.S. at 163 (collecting cases). Another way to think of that is that a speech regulation is "content based if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (quoting *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 383 (1984)).

Defendants' enforcement of Indiana's funeral-licensing laws against Plaintiffs is plainly content-based. Their enforcement turns entirely on the topics Lauren discusses and the ideas and messages she expresses. Defendants can only tell whether Lauren is violating their gag order by

examining the content of Lauren's messages. If Lauren were speaking to her clients about Fort Wayne's weather forecast or about the Pacers' dismal performance, she would be in the clear. But the moment her conversations veer into the topics of planning for death or a funeral, the full weight of Indiana's funeral-licensure scheme snaps into force.

Defendants' cease-and-desist order and motion, as well as the statutes themselves, make plain the content-based nature of their speech regulations. *See supra* pp. 7–9. For example, the Board's Order forbids "discussion of" specific topics: "funeral options," "body disposition," "service choices," and "assistance with paperwork." Compl. Ex. G at 42–43, 45–46. It forbids "verbal guidance" about the topics of "moving, bathing, dressing, and arrangement of the deceased," and "consultation with family" about the topics of "personal information," "music and reading selections," and "religious acknowledgements." *Id*. And it forbids "advice" about the topic of "funeral services." *Id.* The statutes are just as clearly content-based on their face, requiring licensure based on the definitions of funeral services that name a number of specific proscribed topics and even list specific verboten words. *See* Ind. Code § 25-15-2-22; *id.* § 25-15-2-17; *supra* p. 8.

The Supreme Court has repeatedly held that regulations that restrict speech like Lauren's are content-based and trigger heightened First Amendment scrutiny. That's true for regulations on the "creation and dissemination of information." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011). Or where what "trigger[s] coverage under the statute consists of communicating a message," including "speech [that] . . . imparts a 'specific skill' or communicates advice." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27–28 (2010). Lauren's speech fits squarely into all those categories, as it disseminates information, communicates a message, imparts skills, and communicates advice.

It is irrelevant to the First Amendment that Defendants' speech regulations come in the form of an occupational-licensing scheme. Although some lower courts used to treat so-called "professional speech" as receiving a lower form of First Amendment scrutiny, the Supreme Court firmly repudiated that doctrine in *National Institute of Family & Life Advocates v. Becerra* (*NIFLA*), 138 S. Ct. 2361 (2018). The Court explained that "[s]peech is not unprotected merely because it is uttered by 'professionals,'" *id.* at 2371–72, and the Court specifically admonished that States cannot assert an "unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement," *id.* at 2375. "[O]rdinary First Amendment principles" thus protect those who speak as part of their jobs—even if within or adjacent to a licensing regime—including "[d]octors and nurses," "lawyers," "marriage counselors," "bankers," "accountants," "physical therapists," "truck drivers," "bartenders," "barbers," and "many others." *Id.* "By discarding the professional speech doctrine, *NIFLA* rejected the proposition that First Amendment protection turns on whether the challenged regulation is part of an occupational-licensing scheme." *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 932 (5th Cir. 2020) (applying heightened First Amendment scrutiny to regulation of map-drawing). In that vein, the circuit courts have routinely applied heightened First Amendment scrutiny to laws that restrict people from communicating or giving advice in an occupational context. *See, e.g.*, *Billups v. City of Charleston*, 961 F.3d 673, 684, 690 (4th Cir. 2020) (tour guides); *Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020) (remote veterinary advice); *Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020) (providing education on horseshoeing); *Wollschlaeger v. Governor*, 848 F.3d 1293, 1301, 1307 (11th Cir. 2017) (en banc) (medical doctors).

**2. Defendants are unlikely to satisfy strict scrutiny.**

"Content-based regulations" like the Indiana scheme at issue here "are presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). They "can stand only if they survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171 (internal quotation marks omitted). Here, the government is unlikely to satisfy either requirement because the funeral-licensing laws as applied to Plaintiffs do not serve a compelling interest and are far from narrowly tailored.

> *a.* *There is no compelling government interest in preventing adults from receiving education and individualized advice about death.*

There is no *compelling* government interest in preventing death doulas like Lauren from speaking with families about the end of life. Compelling interests are those that sit at the core functions of government such as "combating terrorism," *Humanitarian Law Project*, 561 U.S. at 28, or "preserving public confidence in the integrity of the judiciary," *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). Restricting Plaintiffs from giving emotional comfort and advice about death serves no public interest at all, much less one comparable to protecting American lives from terrorist violence.

"[T]he burden is on the government to show the existence of such an interest." *Worrell Newspapers of Ind., Inc. v. Westhafer*, 739 F.2d 1219, 1222 (7th Cir. 1984), *aff'd*, 469 U.S. 1200 (1985) (quoting *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 786 (1978)). In other words, "[t]he State must specifically identify an 'actual problem' in need of solving," and its "evidence" for this problem should itself be "compelling." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799–800 (2011) (citation omitted). The only possible government interest Plaintiffs can imagine Defendants will proffer is consumer protection. No such interest, however, would be *compelling*.

In part, that is because it cannot be a legitimate interest—much less a compelling one—to deliberately suppress speech to keep consumers ignorant about their own options in preparing for death and their memorials afterwards. *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality opinion) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good."). This constitutional interest in the free flow of information belongs not just to Lauren, but also to her clients who want to "receive information and ideas." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756–57 (1976) (internal quotation marks omitted). The First Amendment rejects a "highly paternalistic approach" and "assume[s] that . . . information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Id.* at 770.

> b.  *Requiring Lauren and Death Done Differently to become licensed funeral directors and build a licensed funeral home to speak is not the least restrictive alternative.*

Even if Defendants had a compelling interest—which they do not—the demands of the funeral-licensing laws are so sweeping and onerous that they are far from narrowly tailored. In other words, even if there were a compelling interest at stake, Indiana's scheme "could still not survive strict scrutiny because" there are "other less restrictive alternatives" to accomplish it. *Ent. Software Ass'n v. Blagojevich*, 469 F.3d 641, 650 (7th Cir. 2006); *see also Perry v. Loc. Lodge 2569 of Int'l Ass'n of Machinists & Aerospace Workers*, 708 F.2d 1258, 1262 (7th Cir. 1983) ("[W]hen First Amendment interests are at stake, the least restrictive means of effectuating government interests must be employed.").

Instead, Indiana has chosen the *most* restrictive means: imposing a blanket prior restraint by demanding licenses to speak. "It is offensive" not only to "the First Amendment, but to the

very notion of a free society," to demand that "a citizen must first inform the government of her desire to speak to her neighbors and then obtain a permit to do so." *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165–66 (2002); *accord Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 802 (1988) ("Generally, speakers need not obtain a license to speak."). In *Watchtower*, the Supreme Court invalidated an ordinance requiring a license to engage in door-to-door hand-billing, and in *Riley* it did the same to a licensing requirement for professional fundraisers soliciting funds for charity. The Constitution's repugnance for such licensing of speech applies just as strongly here.

In fact, the licensing requirement here is especially odious because it is so burdensome. Defendants demand that Lauren become a licensed funeral director and that Death Done Differently become a licensed funeral home to be able to offer education and guidance about death. Compl. ¶¶ 107–08, 123 & Ex. G at 45–46. For Lauren to become a licensed funeral director would require her to attend mortuary school; spend a year working full-time as an intern doing tasks, such as embalming, that have no relevance to her work; take two exams; and pay hundreds of dollars in fees. *Id.* ¶¶ 149–54; *see* Ind. Code §§ 25-15-4-2, -3; 832 Ind. Admin. Code 3-2-1; *supra* p. 10. For Death Done Differently to become a licensed funeral home would require it to build or acquire a physical funeral-parlor structure complete with an embalming room it would never use and pay all associated fees and costs, which could easily cost tens if not hundreds of thousands of dollars. Compl. ¶¶ 155–58; *see* Ind. Code § 25-15-2-15; 832 Ind. Admin. Code 5-1-0.5 *et seq.*; *supra* p. 10.

Neither Lauren nor Death Done Differently can afford the time and tremendous financial cost of these requirements. Compl. ¶¶ 159–61. In practice, then, Indiana's funeral-licensing scheme acts as a total prohibition on Plaintiffs' speech. To what end? Plaintiffs do not perform

the technical activities of a funeral director or funeral home, so requiring them to train for a profession they do not practice and to build a facility they would never use serves no interest at all. It is instead simply a prohibition on giving advice about death if you are not part of the licensed funeral industry.

But "when the Government seeks to regulate protected speech, the restriction must be the 'least restrictive means among available, effective alternatives.'" *United States v. Alvarez*, 567 U.S. 709, 729 (2012) (plurality opinion) (quoting *Ashcroft*, 542 U.S. at 666). Here, there are ample alternatives to protect consumers from whatever harm Indiana imagines. Defendants could update their government websites to provide consumer information about death care to alleviate any concerns they may have. *See id.* (suggesting "Government-created database" as alternative to prohibiting speech to "protect the integrity of the military awards system"). Defendants can also invoke general anti-fraud and consumer protection laws that do not target the content of speech. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (recognizing that government's "legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on [speech]. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly."). And of course, the First Amendment is no barrier to Defendants' licensing non-expressive conduct that may implicate real government health-and-safety interests, such as by regulating embalming bodies or cremating remains. It is the government's duty to "consider[] alternatives" to speech restrictions, *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2389 (2021)—not Plaintiffs' burden. It is enough here simply to observe that many such alternatives obviously exist.

### 3. Defendants' speech restrictions are unlikely to satisfy any level of scrutiny.

Although Defendants' application of Indiana's funeral-licensing laws is content-based and therefore triggers strict scrutiny, the Court need not even apply strict scrutiny because the speech restrictions would fail any level of First Amendment scrutiny. *See, e.g.*, *NIFLA*, 138 S. Ct. at 2367–68; *Sorrell*, 564 U.S. at 571; *see also Billups*, 961 F.3d at 684–85 (collecting cases declining to decide level of scrutiny because regulation fails any level).

Even under intermediate scrutiny, Defendants would be required to show that their restrictions on Plaintiffs' speech can be "justified without reference to the content of the regulated speech" and that they are "narrowly tailored to serve a significant governmental interest." *McCullen*, 573 U.S. at 477 (internal quotation marks omitted). To satisfy that test, "the burden on First Amendment rights must not be greater than necessary to further the important governmental interest at stake." *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 605 (7th Cir. 2012); *accord Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 662 (1994). Defendants "carr[y] the burden of justifying" their speech restrictions, and they must do so with real evidence: Intermediate scrutiny is "not satisfied by mere speculation or conjecture; rather, [Defendants] . . . must demonstrate that" any "harms [they] recite[] are real and that [their] restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993) (internal quotation marks omitted). That requirement includes showing that the government "seriously undertook to address the problem with less intrusive tools readily available to it," and it would not be "enough for [Indiana] simply to say that other approaches have not worked." *McCullen*, 573 U.S. at 494, 496; *accord Billups*, 961 F.3d at 686–90.

For the same reasons Defendants cannot satisfy strict scrutiny, they cannot satisfy intermediate scrutiny. Their indiscriminate application of the burdensome licensing laws to

Plaintiffs' speech reveals that there is no tailoring at all. Nor are Plaintiffs aware of any evidence that there is some actual harm that censoring their speech would alleviate, or that Indiana has considered any alternatives. Thus, even under the somewhat more flexible requirements of intermediate scrutiny, Defendants' application of the funeral-licensing laws would fail.

That is just the result reached in the California death-doula case, finding that the government must "at minimum" satisfy intermediate scrutiny and that it could not do so. *Full Circle of Living & Dying*, 2020 WL 7714200, at *6. As is likely to be the case here, the government defendants there "offer[ed] no evidence to contradict plaintiffs' claims or rebut their evidence" and could not "identify any government interest or explain why" requiring full licensure "does not burden more speech than necessary to further an important interest." *Id.*

### B. Forbidding Plaintiffs From Truthfully Advertising Their Educational And Individualized-Advice Services Likely Fails The *Central Hudson* Test For Restrictions On Commercial Speech.

The likely unconstitutionality of Defendants' restrictions on Plaintiffs' individualized advice and educational speech also dooms the blanket advertising ban as applied to those constitutionally protected services.

#### 1. Plaintiffs' advertising is entitled to First Amendment protection because the education and advice they provide is lawful to give.

The Board's Order commands Plaintiffs to cease advertising the communicative services proscribed by the Order. *See* Compl. ¶ 129 & Ex. G at 46. But the First Amendment protects commercial speech that "concern[s] lawful activity" and is "not . . . misleading." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980). Plaintiffs' commercial speech about their individualized death-care advising and education is indeed lawful because, as demonstrated in the preceding section, those services are fully protected by the First Amendment and cannot constitutionally be proscribed by Defendants. There is also nothing misleading about

21

Plaintiffs' advertising because they are always clear (including in express disclaimers across the website) that Lauren is not a funeral director and that Death Done Differently is not a funeral home. *See* Compl. ¶ 59; *see generally id.* Ex. A.

### 2. Plaintiffs are likely to prevail on their commercial-speech claim because Defendants cannot establish that a complete advertising prohibition is tailored to directly advancing any important interest.

Those facts resolve the first two prongs of the *Central Hudson* test because they show Plaintiffs' speech concerns lawful activity and is not misleading. 447 U.S. at 566; *see Full Circle of Living & Dying*, 2023 WL 373681, at *19 (where death doulas could lawfully provide "services without a funeral establishment license," that "end[ed] the analysis under *Central Hudson*" in favor of commercial-speech claim). That places the burden on Defendants to show that they have a "substantial" interest in restricting Plaintiffs' speech nevertheless and that the Board's blanket gag order "is not more extensive than is necessary to serve that interest." *Cent. Hudson*, 447 U.S. at 566. As explained above, that requires Defendants to put forward real evidence of some substantial consumer harm they are preventing, not "mere speculation or conjecture." *Edenfield*, 507 U.S. at 770; *accord Pagan v. Fruchey*, 492 F.3d 766, 772 (6th Cir. 2007) (en banc) ("*Central Hudson* requires more from the government than bald assertions that a particular speech restriction serves its articulated interests."). Likewise, the strong First Amendment presumption is *against* depriving consumers of information. *Va. State Bd. of Pharmacy*, 425 U.S. at 770.

Defendants cannot carry these burdens. They will have to provide real evidence that consumers—despite Plaintiffs' explicit disclaimers—erroneously perceive Lauren and Death Done Differently to be licensed funeral providers. Yet nobody ever *has* been confused, and Plaintiffs are not aware of anybody who has suggested confusion to the Board, the Attorney General's office, or the IPLA. Compl. ¶¶ 37–38, 83. And even if such confusion existed—which

it does not—the Order's flat ban on all advertising is not tailored at all to ameliorating consumer confusion. Nor may Defendants create a list of words forbidden to Plaintiffs in advertising themselves, *see* Ind. Code § 25-15-8-23, without satisfying intermediate scrutiny. *See Full Circle of Living & Dying*, 2023 WL 373681, at *21 (enjoining prohibition on using term "home funeral guide" for failure to satisfy intermediate scrutiny).

## II. PLAINTIFFS WILL SUFFER IRREPARABLE HARM TO THEIR ABILITY TO GIVE INDIVIDUALIZED ADVICE AND TO ADVERTISE THAT ADVICE IF THE COURT DOES NOT GRANT PRELIMINARY RELIEF.

In First Amendment cases, likelihood of success on the merits means irreparable harm is essentially automatic because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Int'l Ass'n of Fire Fighters, Loc. 365 v. City of E. Chicago*, 56 F.4th 437, 451 (7th Cir. 2022) (brackets omitted) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Thus, "irreparable harm is presumed in First Amendment cases." *Id.* at 450–51; *accord Higher Soc'y of Ind. v. Tippecanoe County*, 858 F.3d 1113, 1116 (7th Cir. 2017) ("[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor . . . because even short deprivations of First Amendment rights constitute irreparable harm[.]" (internal quotation marks and citations omitted)); *Full Circle of Living & Dying*, 2020 WL 7714200, at *7 ("The 'loss of First Amendment rights, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009)).

This case perfectly represents why there is a presumption of irreparable harm. Lauren is now under a governmental order not to speak. Since receiving the cease-and-desist motion, she has already been forced to sacrifice her First Amendment rights, to stop talking to new clients about death care, and to put Death Done Differently's business in stasis. Indeed, Lauren has found other work in part because the enforcement proceedings upended her business.

Compl. ¶ 145. These burdens have had severe, tangible effects on Lauren and her potential clients. At any time, a family could experience a sudden death of a loved one, or a potential client may be diagnosed with a terminal illness, and they would need Lauren's (now prohibited) services immediately. In fact, Lauren has already had to tell a pre-existing client that she can no longer help her, even though the client received a new cancer diagnosis. *Id.* ¶ 163. In these circumstances, common in Lauren's field of work, "delay of even a day or two may be intolerable." *Sanders Cnty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 748 (9th Cir. 2012) (internal quotation marks omitted). Yet without a preliminary injunction while this case is pending, she will be muzzled and unable to offer guidance and support when it is most needed.

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR A PRELIMINARY INJUNCTION.

"[I]n First Amendment cases . . . the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining . . . enforcement . . . that is probably unconstitutional." *Higher Soc'y of Ind.*, 858 F.3d at 1116 (internal quotation marks omitted). Thus, "the analysis begins and ends with the likelihood of success on the merits of the First Amendment claim." *Id.* (brackets omitted) (quoting *Korte*, 735 F.3d at 666). After all, it is in the public interest for the government to follow the Constitution. So where a government entity is "applying [its] policy in a manner that violates [Plaintiffs'] First Amendment rights"—as here—then it "is no harm at all" to the government to enjoin enforcement of that unconstitutional policy. *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). "Stated differently, 'injunctions protecting First Amendment freedoms are always in the public interest.'" *Alvarez*, 679 F.3d at 590 (quoting *Christian Legal Soc'y*, 453 F.3d at 859); *accord Full Circle of Living & Dying*, 2020 WL 7714200, at *7 ("It is always in the public interest to prevent the violation of a party's constitutional rights." (brackets omitted)

(quoting *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012)). Add to that the severe burdens currently suffered by Plaintiffs while they labor under a broad gag order on their speech that has suspended their business, and it is obvious that the equities and public interest tilt decisively in Plaintiffs' favor.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to enter a preliminary injunction protecting their constitutional speech rights for the pendency of this case. The specific requested relief is described in the motion.


RESPECTFULLY SUBMITTED this 30th day of August 2023.

Stephen J. Peters (IN Bar No. 6345-49)
David I. Rubin (IN Bar. No. 22525-53)
Erika Steuerwald (IN Bar. No. 34044-49)
KROGER GARDIS & REGAS, LLP
111 Monument Circle, Suite 900
Indianapolis, IN 46204
(317) 692-9000
speters@kgrlaw.com
drubin@kgrlaw.com
esteuerwald@kgrlaw.com

/s/ *Benjamin A. Field*
Benjamin A. Field (DC Bar No. 1046902)
Christian Lansinger (MD Bar No. 2211290007)
INSTITUTE FOR JUSTICE
901 N. Glebe Rd., Ste. 900
Arlington, Virginia 22203
(703) 682-9320
bfield@ij.org
clansinger@ij.org

Jeff Rowes (TX Bar No. 24104956)
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 960
Austin, TX 78701
(512) 480-5936
jrowes@ij.org

*Counsel for Plaintiffs Lauren Richwine and Death Done Differently LLC*