**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **LAUREN RICHWINE and DEATH DONE DIFFERENTLY LLC,** | ) ) ) |
| **Plaintiffs,** | ) ) |
| **v.** | ) CASE NO.: 1:23-cv-00370-HAB-SLC ) |
| **KATHLEEN DIANE MATUSZAK, THOMAS SPROLES, FRANK DOWNING, and CHRISTOPHER COOKE, in their official capacities as members of the Indiana State Board of Funeral & Cemetery Service; THEODORE ROKITA, in his official capacity as Attorney General of Indiana; and LINDSAY HYER, in her official capacity as Executive Director of the Indiana Professional Licensing Agency,** | ) ) ) ) ) ) ) ) ) ) ) ) |
| **Defendants.** | ) ) ) ) |

**OPINION AND ORDER**

Plaintiff, Lauren Richwine ("Richwine"), is a "death doula." Through her business and co-Plaintiff, Death Done Differently LLC ("Death Done Differently"), Richwine speaks with people about a difficult topic, one many people avoid: death and dying. This includes providing individualized advice to clients and their families to plan for death, options for funeral goods and services, and how they would like to be remembered. Defendants—officials of the State of Indiana—ordered Richwine to cease speaking unless she obtains a funeral-director license for herself and a funeral-home license for her business.

Richwine does not claim to be a funeral director. Nor does she claim to be exempt from Indiana's licensing requirements for funeral directors. *See* Ind. Code § 25-15, et seq. Rather,

1

Richwine claims that she has been muzzled by an overinclusive statutory scheme which has rendered her business comatose. Plaintiffs sued Defendants alleging that the licensing scheme, as applied to Richwine and Death Done Differently, abridges their freedom of speech guaranteed by the First Amendment of the U.S. Constitution. (ECF No. 1). In the meantime—hoping to remove the tape from her mouth and bring her business back from purgatory—Plaintiffs moved to preliminarily enjoin the statutes' application. (ECF No. 2). That motion has been fully briefed (ECF Nos. 2, 26, 29) and is ripe for ruling.

## I.      Factual Background

A "death doula" or a "death midwife" is the death analog to a birth doula or midwife. (ECF No. 1, ¶ 13). When most people think of a conventional funeral, it involves embalming a body, holding a ceremony at a funeral parlor, and cremation or burial in a casket. (*Id.* at ¶ 19). This system often medicalizes death leaving the heavy lifting to hospitals and hospice. (*Id.* at ¶ 20). Medical professionals' typical concerns are on the health of the patient. Even with death impending, they often fail to create an emotionally supportive space for the dying person—and their family—to consider how they wish to approach death and be remembered. (*Id.*)

Death doulas aim to bridge that gap. They provide education in their communities to inform people of their options about death and work with families to develop an individualized plan. Their work, for the most part, involves discussions. These discussions include options for directing death care (medical directives), alternatives for being remembered, and options for disposition of remains. (*Id.* at ¶¶ 15-16, 23-24). Indeed, society has slowly moved away from the conventional death and funeral process embracing alternatives such as home funerals and green burials. Above all, death doulas aim to provide emotional support absent from the conventional system. They encourage people to engage in the important, yet frequently avoided, questions in a largely "death-

phobic culture." (*Id.* at ¶ 28).

Richwine took the gap personally and sought to bridge it herself. She began reading about death care, attending programs, doing in-person mentorships, and speaking with licensed funeral directors. (*Id.* at ¶ 31). Richwine joined the National Assocoiation of Certified Death Midwives, the National End-of-life Doula Alliance, the National Home Funeral Alliance, and The Order of the Good Death. (*Id.* at ¶ 33). She even became a trained facilitator in the "Respecting Choice Advance Care Planning" Program run by Parkview Health Network to help patients make personal plans for end-of-life decisions. (*Id.* at ¶ 32).

In 2019, Richwine made this a vocation and founded her business: Death Done Differently. (*Id.* at ¶ 35). Through her business, she offers individualized advising and planning to help clients and their families develop end-of-life plans covering topics like funeral options, options for body disposition, and choices for remembrance services. (*Id.* at ¶ 41(b)). Her full range of services include:

    a.  <u>Initial Consultation</u>: [Richwine] offers to have a free, no-obligation conversation with potential clients for them to learn more about her services and ask questions. She may direct them to others in the death care community, or she may arrange future individualized services. (Always Free)

    b.  <u>Full End of Life Planning</u>: [Richwine] will discuss end-of-life options with a client and their family. Topics she discusses include: funeral options, options for body disposition (including alternatives such as cremation, traditional burial, or green burial), and choices families have for remembrance services. [Richwine] also offers to advise clients and their families about end-of-life paperwork such as a living will, do-not-resuscitate ("DNR") form, and healthcare power of attorney. ($300-$500)

    c.  <u>Advance Care Planning</u>: [Richwine] will facilitate conversations with a client and their family about desired levels of medical intervention in the case of a sudden accident or medical issue. She will assist with related paperwork such as living will, DNR form, and healthcare power of attorney. ($100-$300)

    d.  <u>Support for Family Led Death Care</u>: [Richwine] will consult as a celebrant with family. She will discuss and coordinate personal information, music and reading selections, religious acknowledgements (if any), and other programming. These conversations ideally take place prior to death so that the dying person is involved in providing their own preferences for post death care and how they would like to be remembered. ($500-$1,000)

    e.  <u>Visits</u>: [Richwine] will visit with clients and family as they approach the end of life to offer emotional support. Her tasks may include readings, music, conversation, healing touch, or general companionship with the individual prior to death. Her services do not include medical treatments, housekeeping, household chores, or childcare. ($50-$80 per hour)

    f.  <u>Vigil</u>: In the active stages of dying immediately leading up to death, [Richwine] offers to be present to provide emotional support. ($50-$80 per hour)

    g.  <u>Legacy Letter for Loved Ones and/or Family</u>: [Richwine] offers to assist a dying person in drafting a letter to loved ones and ensuring it gets to intended recipients. This leverages her creative-writing skills and background to help a dying person express themself. ($50-$100 per letter)

(*Id.* at ¶ 41). Along with these individualized services, Richwine offers educational programs in the community to discuss these topics and mentors others who want to become death doulas. (*Id.* at ¶¶ 53-56).

    Death Done Differently maintained a website. (ECF No. 1-3). The website advertised that Richwine performed her services in conjunction with a licensed funeral director. (*Id.* at 11). But every page on the website contained a footer: "Death Done Differently is an educational consulting organization and is in no way considered a funeral establishment." (*Id.* at 1-12) Additionally, the FAQ page expressly stated that Richwine does "NOT perform any services that funeral directors are licensed to perform." (*Id.* at 6). She claims to be just as explicit in her in-person consultations.

**A.  Indiana's Requirements for Funeral-Related Licensing**

    As explicit as she may be, at least some of Richwine's services fall within Indiana's definition of "the practice of funeral services." *See* Ind. Code § 25-15-2-22. Under Indiana law,

"the practice of funeral services" includes:

> (1) the application of the principles, methods, and techniques of mortuary science to the delivery of funeral services;
>
> (2) the counseling of individuals concerning methods and alternatives for the final disposition of human remains;
>
> (3) the prevention of the spread of infectious and contagious disease from human remains; and,
>
> (4) compliance, in the delivery of funeral merchandise and services, with laws relating to health, public safety, and the environment.

Ind. Code § 25-15-2-22. Unless exempted, "a person that engages in the practice of funeral services without a license under this article commits a Class B infraction." Ind. Code § 25-15-2-24(b). "Person" includes business associations under the statute. Ind. Code § 25-15-2-21.

### B. The Indiana Attorney General's Investigation

In June 2021, Indiana's Professional Licensing Agency ("IPLA") received a complaint from somebody in the funeral services industry that was concerned Richwine and Death Done Differently (collectively hereafter "Plaintiffs") needed a license to conduct certain aspects of the business. (ECF No. 26-1, ¶ 4). An IPLA investigator reviewed Death Done Differently's website and worried that Plaintiffs were engaging in the practice of funeral services without a license. In particular, Plaintiffs' services include: "[d]etermination of final disposition of body," "verbal guidance with loved ones for moving, bathing dressing, and arrangement of the deceased," and "support with the selection of services" at a funeral home. (*Id.* at ¶ 6). The investigator also expressed public health and safety concerns as the website conveyed that dead bodies are not dangerous.[1] (*Id.* at ¶ 9). And she expressed concerns that Plaintiffs were causing consumers to be

---

[1] The website also stated, "the individual given authority to determine the final disposition of the body has up to 72 hours or three days from the time of death to contact the funeral home of their choice. In most cases you do not need to have the body removed immediately following death. Death is not an emergency. (IC 25-15-9-18)." (ECF No. 26-1, at ¶ 9).

overcharged through duplicative services that the state requires funeral directors to provide. (*Id.* at 13).

The IPLA investigator filed a complaint with the Indiana Attorney General Consumer Protection Division and requested a cease-and-desist letter. (*Id.* at ¶ 15). The Attorney General sent a letter to Plaintiffs, requested a response to the Complaint, and continued to investigate. (ECF No. 26-2, ¶¶ 3-5). Based on Plaintiffs' response, it was clear that Richwine lacked training approved by the American Board of Funeral Service Education as required by 832 IAC § 3-1-1 to become a licensed funeral director. (*Id.* at ¶ 14). The Attorney General concluded that three services that Plaintiffs offer fell within the practice of funeral services: "end of life planning, preparation of remains after death, and 'support' with funeral arrangements." (*Id.* at ¶ 13). The Attorney General filed a Motion for Cease-and-Desist Order with Indiana's Board of Funeral and Cemetery Services (the "Board"), and a hearing was scheduled. (*Id.* at ¶¶ 14-15). Plaintiffs stopped taking clients after the motion was filed. (*Id.* at ¶ 20).

### C. The Settlement Agreement

Rather than take their issues in front of the Board, Plaintiffs pursued settlement. (*Id.*). The Attorney General proposed a draft Cease-and-Desist Agreement. (ECF No. 26-11). Drafts were exchanged between Plaintiffs' counsel and the Attorney General's office in which terms were negotiated. (*Id.*) Ultimately, a Cease-and-Desist Agreement (the "Agreement") was reached, the Board adopted it, and the Agreement became a final order in August 2023. (ECF No. 11).

Substantively, the Agreement barred just three services that Plaintiffs offered:

    a. "Full End of Life Planning: $150-$500," which includes "discussion of funeral options, body disposition (cremation, traditional burial, or green burial), service choices, etc. and assistance with paperwork such as living will, DNR form, and healthcare power of attorney."

    b. "Facilitation of Community Death Care: $300-$1,000," which includes

"verbal guidance with loved ones under the direct supervision of a licensed funeral director for moving, bathing, dressing, and arrangement of the deceased," as well as "consultation with family in regard to personal information about the family, music and reading selections, religious acknowledgements (if any) and programming."

\*\*\*

d. "Support with Funeral Home: $100-$300," which includes "accompaniment to funeral home, review of general price list, support with selection of goods and services, presence at funeral service."

(ECF No. 11 at 6-7). The Agreement also ordered Plaintiffs to refrain from "counseling consumers, whether individually or in education events open to the public, in any manner and through any medium, concerning methods and alternatives for the final disposition of human remains" (*Id.* at 11) and cease advertising the services above. Notably, many services that Plaintiffs provided did not come within the scope of the Agreement.

The Agreement contained a provision which states that the "Board shall maintain continuing jurisdiction[,]" along with several waivers of rights. (*Id.*). The waivers establish that Plaintiffs waived many of their rights under Indiana law:

11. Respondents are fully aware of their legal rights under **Indiana law in this matter**, including the right to a hearing before the Board on the charges and allegations in the Motion for Cease and Desist Order; the right to confront and cross-examine witnesses and to present evidence and to testify in such a hearing; the right to the issuance of subpoenas to secure witnesses and the production of evidence; the right to rehearing and judicial review of an adverse Board decision; and all other **rights afforded by Indiana's Administrative Orders and Procedure Act and other applicable Indiana laws.**

12. Respondents voluntarily, knowingly, and intelligently waive **each of these rights under Indiana law**, and Respondents do so to terminate proceedings before the Board under the terms of the agreed Cease and Desist Order memorialized below.

(*Id.* at ¶¶ 11-12) (emphasis added). Plaintiffs and their counsel signed the Agreement which stated "I understand…[that] this is a final disposition and is not subject to further review. I enter into this

Agreement voluntarily, knowingly, and intelligently…" (*Id.* at 11).

Just over a week after the Agreement became a final order, Plaintiffs sued in this Court alleging that the Order unconstitutionally chilled their speech and seeking a preliminary injunction.

## II.   Discussion

### A.   Legal Standard

"A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved." *Ind. Civ. Liberties Union v. O'Bannon,* 259 F.3d 766, 770 (7th Cir. 2001). To obtain a preliminary injunction, a plaintiff must show: (1) that there is a likelihood of success on the merits; (2) that they will suffer irreparable harm without a preliminary injunction; (3) that the balance of equities tips in their favor; and (4) that an injunction serves the best interest of the public. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

"As a threshold matter, a party seeking a preliminary injunction must demonstrate (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Cassell v. Snyders*, 990 F.3d 539, 544–45 (7th Cir. 2021) (quoting *Abbott Labs. v. Mead Johnson & Co.,* 971 F.2d 6, 11 (7th Cir. 1992)). Only when a plaintiff makes this showing should a court consider the remaining two elements: (3) "the irreparable harm the non-moving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied" and (4) "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Id.* at 545 (quoting *Abbott Labs.*, 971 F.2d at 11–12).

### B.   Legal Analysis

In Plaintiffs' motion, they assert that Defendants' enforcement of Indiana's funeral-licensing scheme violates Plaintiffs' freedom of speech guaranteed by the First Amendment as

applied to the states through the Fourteenth Amendment. U.S. Const. Amend. 1 ("Congress shall make no law…abridging the freedom of speech[.]"). In particular, they allege that to forbid Plaintiffs from providing education and individualized advice likely fails any level of First Amendment scrutiny. And Plaintiffs claim that their website's advertising is protected commercial speech and the Board's Order fails the *Central Hudson* test for restrictions on commercial speech. *See Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York*, 447 U.S. 557 (1980).

Before addressing the substantive arguments, Defendants respond with a litany of procedural issues which they contend bars Plaintiffs' claims: (1) Plaintiffs waived their claims through the Agreement; (2) the Court lacks jurisdiction under *Rooker-Feldman* doctrine; (3) the Court should abstain from hearing the case under the *Younger* doctrine, *Younger v. Harris,* 401 U.S. 37 (1971); and (4) both claim and issue preclusion bars Plaintiffs' claims. (ECF No. 26). As for the substantive arguments, Defendants believe: (1) Indiana's licensing scheme only incidentally regulates speech such that strict scrutiny is inapplicable; (2) Indiana's statutes are a reasonable regulation "of professional conduct, even though that conduct incidentally involves speech" under *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2372 (2018); and (3) Plaintiffs' commercial speech is not protected under *Central Hudson.* (*Id.*). The Court will address each of the parties' arguments in turn—starting with Defendants' procedural contentions before addressing the underlying First Amendment claims.

### 1. Waiver and Procedural Arguments

#### a. Plaintiffs Did Not Waive Their Right to Bring First Amendment Claims in This Court.

Constitutional rights may be waived by contract. Even First Amendment rights can be waived if there is "clear and convincing evidence that the waiver is knowing, voluntary, and intelligent." *Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993) (citing *D.H. Overmyer Co.,* 405

U.S. 174). "In the civil no less than the criminal area, courts indulge every reasonable presumption against waiver of fundamental rights." *Fuentes v. Shevin,* 407 U.S. 67, 94 n. 31(1972). And the waiver must, "at the very least, be clear." *Fuentes,* 407 U.S. at 94; *See also Krieg v. Seybold*, 481 F.3d 512, 517 (7th Cir. 2007) ("Waiver of a constitutional right must be clear and unmistakable.").

Defendants first contend that Plaintiffs waived their right to bring First Amendment claims under the terms of the Agreement. Defendants' focus is the Agreement's final provisions where Richwine "voluntarily, knowingly and intelligently" agreed to the terms and understood that the Agreement should serve as "a final disposition and is not subject to further review." Plainly, this language is not a clear and unmistakable waiver of Plaintiffs' First Amendment claims. *See Krieg*, 481 F.3d at 517. The Agreement does not mention Plaintiffs' rights under the federal Constitution. Nor does it even reference the First Amendment. (*See* ECF No. 11). In addition, all other waiver provisions in the contract are limited to "rights under Indiana law" and "rights afforded by Indiana's Administrative Orders and Procedure Act and other applicable Indiana laws." (*Id.* at ¶¶ 11-12). Plaintiffs' claims derive from the federal Constitution, not Indiana law. There was no waiver.

### b. The Court Does Not Lack Jurisdiction under *Rooker-Feldman* Doctrine.

The *Rooker-Feldman* doctrine "prevents the lower federal courts from exercising jurisdiction over cases brought by 'state-court losers' challenging 'state-court judgments rendered before the district court proceedings commenced.'" *Lance v. Dennis*, 546 U.S. 459, 460 (2006) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280 (2005)). However, "[t]he doctrine has no application to judicial review of executive action, including determinations made by a state administrative agency." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 644 n. 3 (2002); *See also Hemmer v. Ind. State Bd. of Animal Health*, 532 F.3d 610, 614 (7th Cir.

2008) ("[T]he question remains whether [the plaintiff] counts as a state-court loser when he lost his state administrative agency proceedings. The Supreme Court has answered this question in the negative.").

The Board is a state administrative agency and the final order is an executive action against Plaintiffs. Under *Verizon* and *Hemmer,* Plaintiffs' claim clearly falls outside the scope of the *Rooker-Feldman* doctrine. Even still, Defendants assert that *Rooker-Feldman* bars claims in two instances: (1) when the plaintiff asks the federal court to overturn an adverse state court judgment and (2) where the plaintiff presents federal claims "that were not raised in **state court** or that do not on their face require review of a **state court's decision**." *Taylor v. Fed. Nt. Mortg. Ass'n,* 374 F.3d 529, 532–33 (7th Cir. 2004) (emphasis added). The latter serves as a jurisdictional bar if those claims are "'inextricably intertwined' with a **state court judgment**." *Id.* at 533 (emphasis added). "While 'inextricably intertwined' is a somewhat metaphysical concept, the 'crucial point is whether the district court is in essence being called upon to review the **state court decision.**'" *Taylor,* 374 F.3d at 533; *See also D.C. Court of Appeals v. Feldman*, 460 U.S. 462, 483-84 n. 16 (1983).

Creatively, Defendants contend that had Plaintiffs proceeded through the administrative process, Plaintiffs' appeal would have gone before an Indiana trial court. (ECF No. 26 at 23). This would have resulted in a state court judgment and given Indiana the chance to examine the issues surrounding its own licensure statutes. (*Id.*). Yet there is one glaring flaw in Defendants' analysis—there is no "state court decision," much less a "state court judgment[,]" under the facts of this case. *See Taylor,* 374 F.3d at 532-33. *Rooker-Feldman* does not apply to the Board's Order because it is no more than executive action by an administrative agency. Plaintiffs' claim does not "on its face require review of a state court's decision" because Plaintiffs waived their rights under

11

Indiana law. The Court is not being "called upon to review a state court decision" because no Indiana court ever rendered a decision. *See id.* No court has extended *Rooker-Feldman* to such lengths.[2] This Court declines to do so now.

### c. This Court Need Not Abstain Under the *Younger* Doctrine.

The *Younger* doctrine does not require this Court to abstain from exercising jurisdiction over Plaintiffs' First Amendment claims. The doctrine restrains federal courts from exercising jurisdiction where state proceedings are ongoing. *See Younger,* 401 U.S. at 43-44. Indeed, "[t]he rule in *Younger v. Harris* is designed to permit state courts to try cases free from interference by federal courts." *Forty One News, Inc. v. County of Lake*, 491 F.3d 662, 665 (7th Cir. 2007). And it applies to certain types of state administrative proceedings. *See Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982). In *Middlesex,* the Supreme Court developed a three-part test to determine whether the *Younger* doctrine applies to executive action:

> The question in this case is threefold:  *first*, do [the state proceedings] constitute an ongoing state judicial proceeding; *second*, do the proceedings implicate important state interests; and *third*, is there an adequate opportunity in the state proceedings to raise constitutional challenges.

*Id.*

Defendants focus on the Board's *Final* Order where it states that the "Board shall maintain continuing jurisdiction[.]" (ECF No. 11 at 11). They believe that this provision supports the notion that there is an ongoing state proceeding. (ECF No. 26 at 25). In response, Plaintiffs highlight the fact that the Order is final so there is no ongoing state proceeding. *See Forty One News,* 491 F.3d

---

[2] Judge Sutton of the Sixth Circuit was particularly critical of the *Rooker-Feldman* doctrine, noting that the Supreme Court has tried to "drive[] a stake through *Rooker-Feldman.*" *VanderKodde v. Mary Jane M. Elliott, P.C.,* 951 F.3d 397, 405 (6th Cir. 2020) (Sutton, J., concurring) ("One could be forgiven for thinking, as I and others did, that, unless your name was Rooker or Feldman, this supposed limit on the jurisdiction of the federal courts applied to no one, save the occasional innocent who thought he could obtain appellate review of a final state supreme court decision in federal district court, as opposed to the U.S. Supreme Court."). "Absent a claim seeking review of a final state court judgment, a federal court tempted to dismiss a case under *Rooker-Feldman* should do one thing: Stop." *Id.* at 409.

at 665 ("*Younger* abstention is appropriate only when there is an action in state court against the federal plaintiff and the state is seeking to enforce the contested law in that proceeding."). From Plaintiffs' perspective, "[w]ith no ongoing proceedings, *Younger* is inapplicable." (ECF No. 29 at 10).

Without requiring the Court to labor over whether the Board's continuing jurisdiction constitutes an ongoing proceeding, Defendants' defense fails the third prong of the Supreme Court's test. *See Middlesex*, 457 U.S. at 432 (asking "is there an adequate opportunity in the state proceedings to raise constitutional challenges."). Although the Order gives the Board continuing jurisdiction, it also waives Plaintiffs' right to judicial review and right to a rehearing with the state courts. (ECF No. 11, ¶¶ 11-12). According to the Order, there is no opportunity for Plaintiffs to raise their First Amendment claims in the state proceedings. Apart from the doubt that the Board's continuing jurisdiction creates an ongoing proceeding, the Order bars Plaintiffs from raising any constitutional challenges with the State. Thus, *Younger* is inapplicable.

### d. Plaintiffs' First Amendment Claims Are Not Precluded

Lastly, Defendants urge the Court to consider claim preclusion and issue preclusion as a bar here.[3] As a threshold matter, this Court must determine what law applies. Defendants believe that Indiana preclusion law applies because the Board was acting in judicial capacity as authorized by Indiana law, so this Court must give the same preclusive effect to administrative findings as an Indiana court would. *See Woodruff v. Wilson*, 484 F. Supp. 2d 876, 927 (S.D. Ind. 2007), *aff'd sub nom. Woodruff v. Mason*, 542 F.3d 545 (7th Cir. 2008) (citing *Goodwin v. Bd. of Trustees of Univ. of Ill.*, 442 F.3d 611, 620 (7th Cir. 2006). Plaintiffs concede that "courts do look to state preclusion doctrine when there is a prior state-court judgment." (ECF No. 35 at 8). But—as has been

---

[3] This Court ordered supplemental briefing on the following issue: "whether Plaintiffs, by agreeing to the Cease-and-Desist Order, are precluded from bringing this action." (ECF Nos. 33-37).

emphasized previously—there is no state court judgment here.

The Full Faith and Credit Statute, 28 U.S.C. § 1738, "requires that state-court judgments be given both issue and claim preclusive effect in subsequent actions under 42 U.S.C. § 1983." *Univ. of Tenn. v. Elliott*, 478 U.S. 788, 796 (1986). Yet "[Section] 1738 is inapplicable to the judicially unreviewed findings of state administrative bodies." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 109 (1991). And that is precisely the case here. The Board issued an Order that was never reviewed by an Indiana court.

"[I]n the absence of a governing statute," courts turn to the "federal common-law rules of preclusion." *Elliott*, 478 U.S. at 794. Because Section 1738 is inapplicable to the Board's unreviewed Order, the question becomes: "what does federal preclusion law have to say about the effect of the Order?" (ECF No. 35 at 9).

Unreviewed agency determinations don't preclude Section 1983 claims, but agency fact-finding may be given issue-preclusive effect. *See Elliott*, 478 U.S. at 799 ("[W]hen a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.") *Id.* Indeed, the Supreme Court has "held that 'it is sound policy to apply principles of issue preclusion to the factfinding of administrative bodies acting in a judicial capacity" but it "has drawn the line at claim preclusion for unreviewed state agency findings." *Staats v. County of Sawyer*, 220 F.3d 511, 514 (7th Cir. 2000) (quoting *Elliott*, 478 U.S. at 797)); *See also Allahar v. Zahora*, 59 F.3d 693, 696 (7th Cir. 1995) ("Agency decisions may have a preclusive effect, but only in the limited area of factfinding."). Other circuits have employed the same distinction.[4]

---

[4] *See, e.g., Dionne v. Mayor & City Council of Baltimore*, 40 F.3d 677, 684–85 (4th Cir. 1994) ("Under *Elliott*, state issue preclusion rules may prevent the relitigation of factual issues already determined by the administrative agency,"

Simply put, the Board's Order does not preclude Plaintiffs' First Amendment claims, but the facts memorialized in the Order may be considered settled. In line with these principles, claim preclusion has no application to the Board's unreviewed Order, but the Board's findings of fact embodied therein are issue preclusive. So, the narrower issue can be framed as follows: "whether any fact found in the Order could sink Plaintiffs' free-speech claims?" (ECF No. 35 at 10).

The Order does memorialize certain facts at paragraphs 1-6 and 13-24. (ECF No. 11). These facts simply conclude that the services Plaintiffs offer fall under Indiana's funeral licensing scheme. (*Id.*). All of these facts are asserted in Plaintiffs' Complaint. (ECF No. 1 ¶¶ 39–74, 123–29). The Order and the Complaint are completely consistent. Affording issue-preclusive effect to the facts in the Order has no impact on the viability of Plaintiffs' free-speech claims.[5] *See Klein v. Perry*, 216 F.3d 571, 574-75 (7th Cir. 2000) (approving the district court's decision to bar the plaintiff from challenging the agency's unreviewed factual findings about what had occurred, but required an independent and rigorous application of First Amendment legal rules by the federal courts to determine whether the plaintiff's speech was constitutionally protected); *See also Taylor v. City of Lawrenceburg*, 909 F.3d 177, 179-81 (7th Cir. 2018) (finding that the plaintiff's First

---

but an "unreviewed state administrative decision at issue here has no claim preclusive effect in the subsequent § 1983 action."); *Edmundson v. Borough of Kennett Square,* 4 F.3d 186, 189 (3d Cir. 1993) ("[I]n section 1983 cases, only state administrative factfinding is entitled to preclusive effect in the federal courts when the agency ruling remains unreviewed by state courts."); *Robinson v. Block*, 869 F.2d 202, 207 n.5 (3d Cir. 1989) ("While we give res judicata effect to the factfindings of administrative agencies, we need not consider ourselves bound by their legal conclusions."); *Peery v. Brakke*, 826 F.2d 740, 746 (8th Cir. 1987) ("*Elliott* directs" only "that a state agency's factfinding is to be given preclusive effect in a subsequent § 1983 action," and there is no preclusion where "the disputed issue . . . is one of law.").

[5] It is important to understand the effect of the Board's Order here. The Order, which creates Plaintiffs' alleged injury, forecloses Plaintiffs' opportunity to obtain judicial review with an Indiana court. Although the Order appears to give the Board continuing jurisdiction, the Board is without authority to consider constitutional defenses which Plaintiffs now make. *See, e.g.*, *Sunshine Promotions, Inc. v. Ridlen*, 483 N.E.2d 761, 764–65 (Ind. Ct. App. 1985) ("It is not within the province of an administrative officer to pass on the validity of a statute."); *see also Consol. Rail Corp. v. Smith*, 664 F. Supp. 1228, 1233 (N.D. Ind. 1987) ("That agencies may not nullify statutes has long been the law."). So, in essence, this Court is asked to preclude Plaintiffs' claims based on an Order from an agency that could not have heard them in the first place. No constitutional claim could be resolved before the Board and the Order— that confers standing—prevents any Indiana court from hearing the issue.

Amendment retaliation claim was precluded because, as matter of fact, the administrative agency found there was "'no causal connection' between the termination proceedings and the [protest] letter" the plaintiff had written and publicized).

Plaintiffs are not precluded from bringing new First Amendment claims that are entirely consistent with the Board's factual findings.[6]

### 2.  Preliminary Injunction Standard

Having disposed of the procedural aspects of this case, the Court must determine whether a preliminary injunction is warranted. Therefore, Plaintiffs must show: (1) that there is a likelihood of success on the merits; (2) that they will suffer irreparable harm without a preliminary injunction; (3) that the balance of equities tips in their favor; and (4) that an injunction serves the best interest of the public. *Winter,* 555 U.S. at 20. Plaintiffs first hurdle is to prove their likelihood of success on the merits for their claim that the Indiana's licensing scheme violates their First Amendment right to freedom of speech.

### a.  Plaintiffs' Likelihood of Success on Their First Amendment Claims.

The Order restricts Plaintiffs' speech in two ways. First, it prohibits Plaintiffs from providing education or individualized advice about end-of-life care. Second, the Order prevents Plaintiffs from advertising those services on their website. Plaintiffs believe that the prohibition on education and individualized advice is a content-based restriction which triggers heightened scrutiny. *See Reed v. Town of Gilbert,* 576 U.S. 155, 165 (2015) ("A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral

---

[6] The Court has considered waiver and claim preclusion at length and is sensitive to Defendants' assertion that Plaintiffs negotiated the agreement upon which they now sue. This Court has searched at length—under Indiana and Federal law—for authority suggesting that such a situation serves as a bar to Plaintiffs' First Amendment claims, but to no avail. And Defendants provide little authority suggesting that traditional standards of federal claim preclusion do not apply to the negotiated Order.

justification, or lack of animus toward the ideas contained in the regulated speech."). And Plaintiffs claim that the ban on advertising restricts truthful commercial speech such that the advertisements are protected by the First Amendment. *See Central Hudson*, 447 U.S. at 566 ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading.").

Defendants posit that Indiana's licensing regime is not a vehicle for chilling Plaintiffs' speech. Rather, they claim the regulations are not content-based and only incidentally involve speech. As such, they urge the Court to find that Indiana's statutes are a proper and reasonable "[regulation] of professional conduct, even though that conduct incidentally involves speech." *Nat'l Inst. of Fam. & Life Advocs.*, 138 S. Ct. at 2372 (hereinafter "*NIFLA*"). Defendants also claim that Plaintiffs' website runs afoul the *Central Hudson* test because it contains misleading information. *See Central Hudson*, 447 U.S. at 566. For clarity, the Court addresses each prohibition separately.

### i.   Restrictions From Providing Education and Advice

As a threshold matter, the Court must determine whether the Order's mandate is content-based. "[C]ontent-based restrictions on speech . . . can stand only if they survive strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 576 U.S. at 171. "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id*. at 163. A regulation is "content based if it require[s] 'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *McCullen v. Coakley*, 573 U.S. 464, 479 (2014) (quoting *FCC v. League of Women Voters of Cal*., 468 U.S. 364, 383 (1984)).

In Indiana, an individual cannot engage in the practice of funeral services without a license. *See* Ind. Code § 25-15-2-24(b). Under Indiana law, the practice of funerals services includes "the counseling of individuals concerning methods and alternatives for the final disposition of human remains." Ind. Code § 25-15-2-22(2). "Funeral services'" definition includes "counseling of survivors of a deceased individual on . . . the services, methods, and alternatives for final disposition of human remains" and "arranging, supervising, or conducting a funeral service in conjunction with the memorialization or the disposition of human remains." Ind. Code § 25-15-2-17. And the statute includes a list of words that unlicensed individuals cannot use to describe their services including "funeral," "funeral service," "funeral arrangement," and any "variant of these words." Ind. Code § 25-15-8-23.[7]

Defendants maintain that these statutes are a proper exercise of Indiana's police powers to maintain standards among members of a licensed profession. *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978); *see, e.g., Douglas v. Noble*, 261 U.S. 165 (1923) (licensing dentists); *McNaughton v. Johnson*, 242 U.S. 344 (1917) (excluding ophthalmologists from optometry); *Collins v. Texas*, 223 U.S. 288 (1912) (licensing osteopaths). This authority includes the power to set up licensing boards to admit or exclude people from a profession. *Douglas*, 261 U.S. 165; *Collins*, 223 U.S. 288; *Watson v. Maryland*, 218 U.S. 173 (1910). But the question here is not how Indiana's funeral-licensing scheme operates in the abstract; the question is whether the regulation restricts speech because of its content. As with lawyer speech, the government cannot escape the First Amendment by claiming it is regulating conduct when the supposed "conduct triggering coverage under the statute consists of communicating a message." *Holder v. Humanitarian Law*

---

[7] "A person that renders or offers to render services to the public, if the words 'funeral service,' 'funeral directing,' 'undertaking,' 'funeral,' 'funeral arrangement,' 'embalming,' or a variant of these words is used to describe the services, without a license issued under this article commits a Class B infraction." Ind. Code § 25-15-8-23.

*Project*, 561 U.S. 1, 28 (2010).

This is all the more true considering the Supreme Court's decision in *NIFLA*. 138 S. Ct. 2361. Prior to *NIFLA*, some Courts of Appeals recognized "professional speech" as its own category of speech subject to a different rule. *Id.* at 2371. But the Supreme Court expressly rejected that notion. *NIFLA,* 138 S. Ct. at 2372 ("This Court's precedents do not permit governments to impose content-based restrictions on speech without 'persuasive evidence . . . of a long (if heretofore unrecognized) tradition' to that effect…This Court's precedents do not recognize such tradition for a category called 'professional speech.'"). And all authority Defendants cite in support came well before *NIFLA*.[8] Thus, Indiana's statutes are not exempt from heightened scrutiny merely because they regulate the professional speech of licensed funeral directors. States cannot exercise "unfettered power to reduce a group's First Amendment right by simply imposing a licensing requirement." *Id.* at 2375.

That said, Defendants' enforcement of the funeral licensing scheme against Plaintiffs is content based. The statutes' enforcement here turns entirely on the topics that Plaintiffs discuss and the messages they express. On their face, the funeral licensing statutes ban unlicensed "counseling of individuals concerning methods and alternatives for the final disposition of human remains" and "counseling of survivors" about the same. Ind. Code §§ 25-15-2-17, 25-15-2-22. Under the authority of those statutes, the Board ordered Plaintiffs to cease "[d]iscussion of funeral options"; "verbal guidance" and "consultation" with families about death care; "provid[ing] advice" about funeral services; and "counseling consumers" about those topics. (ECF No. 11). Any violation of the Order requires examination of the content of Plaintiffs' messages. *See*

---

[8] "By discarding the professional speech doctrine, *NIFLA* rejected the proposition that First Amendment protection turns on whether the challenged regulation is part of an occupational-licensing scheme." *Vizaline, L.L.C. v. Tracy*, 949 F.3d 927, 932 (5th Cir. 2020).

*McCullen*, 573 U.S. at 479.

Even still, *NIFLA* maintained two exceptions which "afforded lesser protections for professional speech." *NIFLA,* 138 S. Ct. at 2372. The first is an exception for laws that "require professionals to disclose factual, noncontroversial information in their 'commercial speech.'" *Id.* (citing *Zauderer v. Off. of Disciplinary Counsel of Supreme Court of Ohio,* 471 U.S. 626, 651 (1985)). A lower level of scrutiny applies to laws that compel disclosures in certain contexts. *Id.* Second, "[s]tates may regulate professional conduct even though that conduct incidentally involves speech." *Id.*

To highlight the first exception, Defendants rely on *Zauderer*. In that case, the Court acknowledged that 'commercial speech' receives First Amendment protection, but the protections are "somewhat less extensive than that afforded [to] noncommercial speech." *Zauderer,* 471 U.S. at 637. In analyzing Ohio's attorney advertising requirements, the Court noted that the State did not prevent attorneys from conveying information, but merely required them to provide more information in their advertising that was factual and noncontroversial. *Id.* at 650-51. Defendants believe their funeral statutes are analogous because they only require funeral directors to disclose factual and noncontroversial information as part of their duties. (ECF No. 26 at 32).

The Court is not convinced that the individualized advice and education that Plaintiffs provide is commercial speech, unlike their website's advertisements. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 201) ("The Supreme Court] has provided this basic definition: Commercial speech is "speech that proposes a commercial transaction."). And the Order is drafted broadly enough to encompass much more than just commercial speech. It Orders Plaintiffs to "refrain from counseling consumers, whether individually or in educational events open to the public, in any manner and through any medium, concerning methods and alternatives

20

for the final disposition of human remains." (ECF No. 11 at 10). Further, nothing in the Order indicates that Plaintiffs could resume offering their services if they made a factual, noncontroversial disclosure. Instead, Plaintiffs are banned completely from discussing certain topics whether or not those discussions are commercial in nature.[9] *Zauderer* does not apply to the individualized advice and education Plaintiffs provide.

As for the second *NIFLA* exception, "the First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Burdens are "incidental" when they flow from the core purpose of the regulation. *Id.* Indeed, courts have upheld restrictions which are aimed at conduct but incidentally burden speech. *See Rumsfeld v. Forum for Academic and Institutional Rts., Inc.,* 547 U.S. 47, 62 (2006) (a ban on race based hiring required employers to remove "White Applicants Only" signs); *R. A. V. v. St. Paul*, 505 U.S. 377, 391 (1992) (upholding an ordinance against outdoor fires forbidding flag burning); *Morgan v. White,* 964 F.3d 649, 652 (7th Cir. 2020) (holding that speech was only incidentally burdened when a COVID-related social distancing order makes it harder for a campaign to round up signatures).

In *Del Castillo v. Secretary, Florida Dep't of Health* is like this case. 26 F.4th 1214 (11th Cir. 2022), in that case, Del Castillo ran a health coaching business but lacked the license required by Florida's Dietetics and Nutrition Practices Act. *Id.* at 1216-17. Del Castillo offered a myriad of speech-based services:

---

[9] Commercial speech is not confined to the just "speech that proposes a commercial transaction." Indeed, "[w]hen deciding if speech is commercial, appropriate considerations include whether: (1) the speech is an advertisement; (2) the speech refers to a specific product; and (3) the speaker has an economic motivation for the speech." *United States v. Benson*, 561 F.3d 718, 725 (7th Cir. 2009). Plaintiffs do have an economic motivation for their speech, but not in all contexts. For example, the Court is not convinced that providing education to the public about misconceptions surrounding death has economic motivations. Nor do we believe the individualized advice that Plaintiffs provide is always guided by an economic interest.

Del Castillo's business focused on "[o]ne-on-one health coaching," which she described as "meeting with clients and discussing overall health and wellness, as well as goal setting." She gave them tailored advice on dietary choices, exercise habits, and general lifestyle strategies. For example, Del Castillo recommended vitamin supplements to some clients with low energy and told them to consult with their physicians before taking the supplements. For another client with food intolerances, Del Castillo recommended health goals that fit within a list of foods to avoid provided by the client's doctor.

Before her initial consultation with a new client, Del Castillo would ask them to fill out a "health history form." The health history form sought general background information about the client, like his or her age and occupation, as well as particulars about the client's dietary health, including past serious illness or recent weight change. Del Castillo used this form to get an overall picture of her client's health but did not make medical conclusions. Instead, she would recommend that a client consult a doctor if the client had experienced something unusual like drastic weight loss. Del Castillo never held herself out to her clients as a health care professional, never gave a diagnosis or provided medical treatment, and never gave advice contrary to physician advice.

*Id.* Florida's statute regulating "dietetics and nutrition" encompassed many of the "communicative" services Del Castillo supplied. *Id.* at 1225. Del Castillo challenged Florida's Act on First Amendment grounds and the Eleventh Circuit upheld the statute. *Id.* Relying on pre-*NIFLA* precedent from the same circuit, the court determined that Florida's regulations only incidentally burdened speech. *Id.* (citing *Lock v. Shore,* 634 F.3d 1185 (11th Cir. 2011) (holding that an interior designer licensing scheme did not violate the plaintiff's First Amendment free speech rights)).

The similarities between these cases are glaring.[10] Defendants believe a similar approach to *Del Castillo* is warranted. Plaintiffs direct us to a different case. *See Holder* 561 U.S. 1 (2010).

---

[10] Defendants brief gave the following comparison between this case and *Del Castillo*: "Plaintiffs categorize their services as purely speech, just as the *Del Castillo* plaintiff framed her business as giving advice on diet choices, exercising, and general lifestyle opinions. Plaintiffs disclaim that they need the same training as those who are licensed to practice funeral services because Ms. Richwine works in conjunction with and/or under the supervision of licensed funeral directors, while the *Del Castillo* plaintiff claimed that she instructed her clients to 'consult with their physicians' before beginning any medication or health plan she devised. *Del Castillo*, 26 F.4th at 1216. Moreover, much like the way the *Del Castillo* plaintiff 'never held herself out to her clients as a health care professional, never gave a diagnosis or provided medical treatment, and never gave advice contrary to physician advice,' *Id.* at 1217, Plaintiff Richwine states that she is not a funeral director and does not provide services that funeral directors do by

In *Holder,* the government argued that because the statute—which forbid material support for terrorist— "*generally* functions as a regulation of conduct," strict First Amendment scrutiny was inapplicable when the statute was employed to restrict a lawyer's speech. *Id.* at 27-28. The Supreme Court rejected that argument and held that when a generally applicable law is "directed at [a person] because of what his speech communicated," heightened scrutiny is warranted. *Id.* at 28. If the activity that actually "triggers coverage under the statute consists of communicating a message," strict scrutiny applies. *Holder* 561 U.S. at 28 ("The law here may be described as directed at conduct…but as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message.").

Unlike the Eleventh Circuit, the parties have identified no pre-*NIFLA* cases from the Seventh Circuit which are binding on this Court. *See Del Castillo,* 26 F.4th at 1225-26 ("[W]e are not at liberty to disregard binding case law that is so closely on point and has been only weakened, rather than directly overruled, by the Supreme Court."). And other circuits have recognized that *NIFLA* abrogated their earlier professional speech cases to require strict First Amendment scrutiny of professional licensing laws. *See Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068–69 (9th Cir. 2020); *Billups v. City of Charleston*, 961 F.3d 673, 684, 690 (4th Cir. 2020); *Vizaline*, 949 F.3d at 933. Even the Eleventh Circuit in an earlier opinion acknowledged the dangers of categorizing restrictions on speech as merely incidental to conduct:

> But there is a real difference between laws directed at conduct sweeping up incidental speech on the one hand and laws that directly regulate speech on the other. The government cannot regulate speech by relabeling it as conduct. As we have said, characterizing speech as conduct is a dubious constitutional enterprise,

---

specifically avoiding the buzzwords stated in the statute. (ECF 1, ¶¶ 59, 61). Furthermore, the *Del Castillo* plaintiff had a certificate in 'holistic health coaching,' but did not have the 'necessary education and professional experience' to get a dietician or nutritionist license. *Del Castillo*, 26 F.4th at 1217. Likewise, Plaintiff Richwine has a bachelor's degree in creative writing, took a program from Earth Traditions, volunteered in hospice care, and is a member of alternative disposition alliances. (ECF 1, at ¶5; ECF 1-3, at 7)." (ECF No. 26 at 33-34).

> and labeling certain verbal or written communications "speech" and others
> "conduct" is unprincipled and susceptible to manipulation.

*Otto v. City of Boca Raton*, 981 F.3d 854, 861 (11th Cir. 2020) (internal quotations and citation

omitted).

Those dangers are real. *Del Castillo* allowed a state to transform pure speech about diet

advice into non-expressive conduct by simply labeling it "the practice of dietetics." Applying the

same rationale, professors' lectures could become "the practice of instruction"; musicians' songs

could become "the practice of composing" and; writers' op-eds could become "the practice of

journalism." Pursuant to *Del Castillo,* as long as the government can permissibly regulate some

form of conduct, they could chill vast amounts of speech. "States cannot choose the protection that

speech receives under the First Amendment" simply by calling "something a 'profession'" just

because "it involves personalized services and requires a professional license from the State."

*NIFLA,* 138 S. Ct. at 2375.

All Plaintiffs do is speak.[11] Indiana's funeral-licensing laws specifically prohibits "the

counseling of individuals concerning methods and alternatives for the final disposition of human

remains" without a license. Ind. Code § 25-15-2-22(2). This provision, which the Board relied on

in its Order, "directly regulate[s] speech." *See Otto,* 981 F.3d at 861. And the Order only bars

Plaintiffs' services that involve speech. (ECF No. 11). As applied to Plaintiffs, "the conduct

triggering coverage under the statute consists of communicating a message." *See Holder* 561 U.S.

at 28. Because "*NIFLA* rejected the proposition that First Amendment protection turns on whether

the challenged regulation is part of an occupational-licensing scheme" and Indiana's funeral-

---

[11] Defendants contend Plaintiffs do more than speak based on a declaration by a cemetarian. (ECF No. 26-13). The
cemetarian claims that Richwine, on one occasion, told him that she intended to transport a body and, twice, shrouded
a body. (*Id.* at ¶¶ 4-9). This is a red herring. From the administrative records provided to the Court, there is no mention
of these events and this was never Defendants' concern. Nor does the Board's Order concern any such activities.

licensing scheme directly regulates speech, ordinary First Amendment principles apply. *Vizaline*, 949 F.3d at 932. Indiana's content-based restriction of Plaintiffs' speech receives strict scrutiny.

"Content-based regulations are presumptively invalid." *R. A. V.,* 505 U.S. at 382. To survive strict scrutiny, "the Government must prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed,* 576 U.S. at 171. Defendants must "specifically identify an 'actual problem' in need of solving and the curtailment of free speech must be actually necessary to the solution." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799–800 (2011) (citation omitted). "Though there is no exact definition of a compelling interest, it is one 'of the highest order' and is only found in 'rare cases.'" *Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 745 (7th Cir. 2015) (quoting *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 546 (1993)).

To that end, Defendants provide two interests which they believe are of the highest order. The first is public health and safety. Indeed, the statutes here require arrangement "for the final disposition of human remains in compliance with public health and safety laws and in a manner that prevents the spread of infectious disease." Ind. Code § 25-15-2-17. Defendants suggest that they can regulate Plaintiffs' advice that their client can choose the option of a funeral home and, in normal circumstances, safely keep a body at home for three days after death. (ECF No. 26 at 23, 29). Yet the only evidence that they provide is the declaration of an IPLA investigator and a cemetarian who stated that keeping a body un-embalmed or un-refrigerated for too long can create "potential" health concerns in "certain" circumstances. (ECF No. 26-1, ¶ 10; ECF No. 26-13, ¶ 11). That kind of "mere speculation and conjecture" falls short.[12] *See Edenfield v. Fane*, 507 U.S.

---

[12] In any event, Indiana law turns Defendants' argument on its head. While Defendants posit that keeping a body at home for three days is a public health concern, Indiana gives next of kin "up to 72 hours or three days from the time of death to contact the funeral home of their choice…to determine the final disposition of the decedent's remains" before the obligation to arrange for disposition passes to another. Ind. Code § 25-15-9-18(f). The Court acknowledges

761, 770 (1993) (finding that the government failed to meet the burden under intermediate scrutiny). Nor have Defendants provided any compelling evidence of an "actual problem." *See Brown,* 564 U.S. at 799–800.[13]

The second interest is consumer protection. Defendants assert that Indiana has compelling interests in protecting consumers from making poor choices about the disposition of their loved ones and avoiding the duplicative costs of hiring Plaintiffs to help select services which ultimately are conducted by a licensed funeral director. (ECF No. 26 at 2-3, 29). In support, Defendants provide two Attorney General employees' testimony which expressed concerns that Plaintiffs' services overlapped with that of a licensed funeral director. (ECF No. 26-6, ¶ 12(d); ECF No. 26-2, ¶ 22(c)). Defendants also provided a funeral director's testimony who stated one of their "biggest concerns" was Plaintiffs "accompanying [families] to the funeral home to assist them in selecting funeral services." (ECF No. 26-12, ¶ 16).

The Court is not convinced that Defendants have shown a compelling interest in consumer protection. *See First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 786 (1978) ("[T]he burden is on the government to show the existence of such an interest.") Although consumer protection may be compelling in some situations, there is nothing compelling about deliberately suppressing speech to keep consumers ignorant about their options in preparing for death and subsequent memorials. *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 503 (1996) (plurality opinion) ("The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good."). The First Amendment rejects a "highly

---

the common sense that dead bodies pose a risk in some circumstances within that time frame. But it is axiomatic to give people three days from death before they even have to contact a funeral home while claiming that Plaintiffs' advice poses a risk to public health.

[13] On a summary-judgment record, a California district court held that it wasn't rational to require funeral-establishment licensure even to physically assist with a home funeral because there was no evidence of public-health issues. *See Full Circle of Living & Dying v. Sanchez*, 2023 WL 373681, at *13–14 (E.D. Cal. Jan. 24, 2023). That issue was decided under a rational-basis standard, a much more lenient standard for the government than strict scrutiny.

paternalistic approach" and "assume[s] that . . . information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976). If families choosing what services they want from a funeral home find value in a knowledgeable advisor without a financial stake in their purchases, that is the consumer's choice to make. (ECF No. 29 at 21). And, again, there is no actual evidence that Plaintiffs' advice ever harmed a consumer. Consumer protection is not a compelling interest here.

Even if the Court were to find Defendants' proposed interests compelling, the blanket speech ban is far from the least restrictive means. *See Perry v. Loc. Lodge 2569 of Int'l Ass'n of Machinists & Aerospace Workers*, 708 F.2d 1258, 1262 (7th Cir. 1983) ("[W]hen First Amendment interests are at stake, the least restrictive means of effectuating government interests must be employed."). Defendants here do not even argue that Indiana's statutes are narrowly-tailored. Meanwhile, Plaintiffs have provided several "effective alternatives."[14] *See United States v. Alvarez*, 567 U.S. 709, 729 (2012) (plurality opinion) ("[W]hen the Government seeks to regulate protected speech, the restriction must be the least restrictive means among available, effective alternatives."). Of course, the First Amendment is no barrier to Defendants' licensing non-expressive conduct such as embalming bodies or cremation. But the statutes as applied here are more akin to a blanket prior restraint of Plaintiffs' speech. Defendants advanced no argument to combat that notion.

---

[14] "Defendants could update their government websites to provide consumer information about death care to alleviate any concerns they may have. *See Alvarez*, 567 U.S. 709. (suggesting 'Government-created database' as alternative to prohibiting speech to 'protect the integrity of the military awards system'). Defendants can also invoke general anti-fraud and consumer protection laws that do not target the content of speech. *See Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 637 (1980) (recognizing that government's 'legitimate interest in preventing fraud can be better served by measures less intrusive than a direct prohibition on [speech]. Fraudulent misrepresentations can be prohibited and the penal laws used to punish such conduct directly.')." (ECF No. 3 at 19).

#### ii. Plaintiffs' Advertisements

As for Plaintiffs' advertisements, the parties agree that they are commercial speech. The First Amendment protects commercial speech that "concern[s] lawful activity" and is "not…misleading." *Central Hudson*, 447 U.S. at 566. In *Central Hudson,* the Supreme Court employed a four-part test to determine whether First Amendment protection applies: (1) "Whether the speech concerns lawful activity and is not misleading"; (2) [Whether t]he asserted government interest is substantial"; (3) "Whether the regulation directly advances the government interest asserted"; and (4) "Whether it is not more extensive than is necessary to serve that interest." *Pearson v. Edgar*, 153 F.3d 397, 401 (7th Cir. 1998) (quoting *Central Hudson,* 447 U.S. at 566). "Steps three and four of the *Central Hudson* test examine the fit between the restriction on speech and the government's justification for that restriction." *Id.*

The parties most hotly dispute the first prong of the test. Defendants posit that Plaintiffs' website contained several misleading statements. First, they claim that the website states that Plaintiffs work lawfully under the supervision of a licensed funeral director, but there is no provision by which funeral directors may delegate their authorities to unlicensed individuals through supervision. (ECF No. 26 at 35). Second, they are concerned with the services that Plaintiffs offer which are duplicative of a funeral directors' services. (*Id.*) Lastly, Defendants take issue where Plaintiffs' website states that: "the individual given authority to determine the final disposition of the body has up to 72 hours or three days from the time of death to contact the funeral home of their choice. In most cases you do not need to have the body removed immediately following death. Death is not an emergency. (IC 25-15-9-18)." (ECF No. 26-1, at ¶ 9).

First, the Court does not find it deceptive to state that Plaintiffs work in conjunction with licensed funeral directors. And Plaintiffs do not represent that they work under a funeral director's

supervision. The portion of Plaintiffs' website that Defendants cite does not even say so. Rather, Plaintiffs explicitly tell consumers that they must "hire a funeral director" and that Plaintiffs "do NOT perform any services that funeral directors are licensed to direct such as body care, death certificate filing, transportation, or making arrangements. My services are entirely educational." (ECF No. 1-3 at 7). As further support, every page of the website contained an explicit disclaimer: "Death Done Differently is an educational consulting organization and is in no way considered a funeral establishment. Any contributions received by Death Done Differently are for requested consulting services and private or public education." (*Id.*). To that end, Plaintiffs do not suggest they are allowed to perform the services of a licensed funeral director by merely being under their supervision. Nor are Plaintiffs deceptive in providing certain communicative services generally within the province of licensed funeral directors. As earlier stated, if the consumers find value in having advice from an entity without a pecuniary incentive in their loved one's passing, that is their choice.

Third and finally, Defendants attack Plaintiffs' website where they state, "the individual given authority to determine the final disposition of the body has 72 hours or three days…to contact the funeral home of their choice."[15] (ECF No. 1-3 at 11). Defendants provide the testimony of an IPLA investigator and a cemetarian which state, "from their personal experiences[,]" a dead body can present a public health concern. (ECF No. 26 at 36). Although these personal anecdotes support that position, Indiana law appears to make Plaintiffs' assertion true. *See* Ind. Code § 25-15-9-18(f) (stating that "the individual given authority to determine the final disposition of the body has 72 hours or three days…to contact the funeral home of their choice."). And while it may be necessary

---

[15] Defendants also contend that Plaintiffs' website "tells consumers that there is nothing dangerous about a dead body." (ECF No. 26 at 36). After reviewing Plaintiffs' website, this is an overstatement. Much of the information indicates embalming is not required under state law. (ECF No. 1-3 at 11). And this is a true statement—embalming is not a legal requirement. Ind. Code § 25-15-8-5.

to "have the body immediately following death" in some circumstances, consumers are expressly told on the website that immediate removal is not necessary "[i]n most cases." (ECF No. 1-3 at 11). Defendants point to no other provision of Indiana law that requires disposition faster under ordinary circumstances than Plaintiffs' website. *See* Ind. Code. § 23-14-54-1 (disposition of human remains required only "within a reasonable time after death."). That said, Plaintiffs' website is not misleading.

Defendants assert the same two interests which they view as substantial: (1) public health and (2) consumer protection. *See Pearson v. Edgar*, 153 F.3d at 401 (The government's asserted interest must be "substantial."). Even if these interests are substantial, "the fit" between the Indiana statutes and Defendants' justification gives this Court reason to believe Plaintiffs will likely succeed on the merits. *See id* (The regulation cannot "be more extensive than necessary to serve that interest.").

Indiana's statutes appear more extensive than necessary to advance public health and consumer protection. Defendants emphasize that the licensing scheme provides exemptions for certain people who conduct religious or memorial services to support that Indiana's statutes do not overreach. Indeed, even those who conduct a religious or memorial service with the remains of the deceased present may do so without a license so long as they are under the direct supervision of a funeral director. *See* Ind. Code § 25-15-2-10. But that does not explain why it is "necessary" to apply a commercial speech ban on Plaintiffs. To the contrary, the fact that other non-funeral directors are allowed to offer and advertise death-related services demonstrates that the public does not have an interest in giving funeral directors a monopoly over end-of-life discussions. Why are those who put on memorial services given this discretion but not Plaintiffs? The Court sees no practical justification and Defendants have not provided one. Plaintiffs will likely succeed on the

merits where a statute arbitrarily selects who can discuss death while prohibiting others who are likely more qualified. While Indiana may be concerned with the "safe and legal handling of remains following death[,]" all Plaintiffs do is speak. They do not "handle[]" any remains. (ECF No. 26 at 37).

### b. Remaining Preliminary Injunction Arguments

This Court is satisfied that Plaintiffs have shown a likelihood of success on the merits of their First Amendment claims. Plaintiffs must also show: (2) that they will suffer irreparable harm without a preliminary injunction; (3) that the balance of equities tips in their favor; and (4) that an injunction serves the best interest of the public. *Winter,* 555 U.S. at 20. Defendants do not address these prongs in their briefing. (ECF No. 26).

Simply put, there is irreparable harm to Plaintiffs' business absent a preliminary injunction because it has been placed in stasis under the Board's Order. Plaintiffs cannot operate and are losing money daily. So too, their potential clients are deprived from Plaintiffs' services in moments where time is certainly of the essence. The balance of equities also tips in their favor. *See Higher Soc'y of Ind. v. Tippecanoe Cty.*, 858 F.3d 1113, 1116 (7th Cir. 2017) ("[E]ven short deprivations of First Amendment rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably unconstitutional."). And "injunctions protecting First Amendment freedoms are always in the public interest." *Alvarez*, 567 U.S. at 590. Plaintiffs have met their burden.

### III.    Conclusion

For the reasons above, Plaintiffs' First Motion for a Preliminary Injunction (ECF No. 2) is GRANTED. Defendants and their agents are ENJOINED from enforcing the Board's Cease-and-Desist Order against Plaintiffs during the pendency of this litigation.

SO ORDERED on December 19, 2023.

 s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT